UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re<br><br>SOUTHBRIDGE ASSOCIATES, LLC<br><br>Debtor | Chapter 11<br>Case No. 26-41208-EDK |

**X-CALIBER RURAL CAPITAL, LLC'S**
**EXPEDITED MOTION (I) FOR RELIEF FROM THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, (II) TO DISMISS DEBTOR'S CHAPTER 11 CASE**

**EXPEDITED DETERMINATION REQUESTED**

X-Caliber Rural Capital, LLC ("X-Caliber"), senior secured lender to debtor Southbridge Associates, LLC ("Debtor"), files this expedited motion (1) for relief from the automatic stay to exercise its rights and remedies against its collateral or, in the alternative, (2) to dismiss Debtor's chapter 11 case, files the Declaration of Jeff Deines (the "Deines Declaration") in support thereof, and respectfully states as follows:

## PRELIMINARY STATEMENT

1. X-Caliber, Debtor's senior secured creditor with a lien on all of Debtor's assets, seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2), because there is no equity in Debtor's assets and Debtor has no reasonable likelihood of reorganizing, and for cause pursuant to 11 U.S.C. § 362(d)(1), because X-Caliber is not adequately protected. In the alternative, X-Caliber seeks dismissal of this case pursuant to 11 U.S.C. § 1112(b) for cause. Cause exists under 11 U.S.C. § 1112(b)(4)(A) and dismissal is in the best interest of creditors because there is substantial and continuing loss to and diminution of the estate and no reasonable likelihood of rehabilitation. Cause also exists under 11 U.S.C. § 1112(b) because the petition was filed in bad faith by Debtor's principal, Barry Lundgren.



159505060

2. As X-Caliber previewed in its Cash Collateral Objection,[1] Lundgren has spent the last six months buying the equity interests of Debtor and its affiliates for pennies on the dollar in an effort to own and control Debtor's hotel and the surrounding mixed-use buildings in the campus shared by Debtor and a number of its affiliates. A map of the campus of buildings surrounding Debtor's hotel and ownership thereof is attached as a demonstrative hereto as **Exhibit 1**. In July 2026, Lundgren purchased the equity interests of twelve such entities for a total of $35,000; two of those twelve include the upstream equity holders of Debtor. (Deines Decl. ¶ 15.) Lundgren did not purchase the equity interests of Debtor directly. (*Id.*)

3. Up until a few weeks before the petition date, Lundgren claimed he wanted to buy the hotel—not surprisingly, at below market numbers and with financing from X-Caliber. (*Id.* ¶ 12.) The first time X-Caliber learned of Lundgren's position that he owned and controlled the majority equity interest in Debtor was through Debtor's bankruptcy petition. (*Id.* ¶ 15.)

4. Rejecting Lundgren's attempts to purchase the hotel without a commercially reasonable auction, X-Caliber noticed a foreclosure sale of the hotel for October 7, 2026. (*Id.* ¶¶ 10, 12.) The foreclosure sale was the culmination of intense and extensive marketing. Multiple parties were set to participate in the foreclosure auction and engage in competitive bidding. (*Id.* ¶ 11.)

5. Lundgren, well aware of the robust marketing of Debtor's hotel and assets for sale through foreclosure by X-Caliber and the third-party interest therein, filed this case on the eve of the foreclosure sale (without giving prior notice, knowing parties were coming from out of state for the sale and causing many to incur unnecessary costs). (*Id.* ¶ 13.) This filing was clearly

[1] "Cash Collateral Objection" refers to X-Caliber Rural Capital, LLC's (I) Objection to Debtor's Emergency Verified Motion for Order Authorizing Use of Cash and Non-Cash Collateral and (II) Demand for Adequate Protection [Docket No. 27] (the "Cash Collateral Objection"). Capitalized terms used, but not defined herein have the meanings ascribed to them in the Cash Collateral Objection.

commenced to scare off buyers and devalue the hotel so Lundgren can move forward at the expense of creditors and for his own self-interest and profit.

6. Lundgren's self-interest and attempts at profit are not hard to identify and present insurmountable conflicts of interest.

7. By way of example, Lundgren purchased the equity interests of SBC Energy LLC ("SBC") in September 2026, just weeks before the scheduled foreclosure sale and for a mere $10,000.[2] (*Id.* ¶ 16.) SBC is a cogeneration power plant that originally supplied the power from NatGrid to the hotel and the rest of the campus. (*Id.*) The purpose of a cogeneration plant is to produce electricity, which creates extra heat that the plant uses to heat and cool water.[3] (*Id.*) The hot and cold water are used to heat and cool the properties. (*Id.*) In April 2026, when Lundgren learned that SBC's contract *with one of his buildings on the campus*, 15 Wells, was structured for above market rates, he orchestrated a termination of that power contract to his benefit. (*Id.* ¶ 22.) However, one of Lundgren's other buildings, 5 Wells, still needs SBC to operate and provide it power. (*Id.*) The 5 Wells building is subject to a triple net lease whereby the tenant, instead of Lundgren, pays for the electricity. (*Id.*)

8. Around the same time Lundgren reached a termination of SBC's agreement with 15 Wells, SBC had an equipment malfunction that prevents it from providing hot water to Debtor's

---

[2] While Lundgren's counsel informed the Court at the first day hearings that Lundgren has not closed on the purchase, that is not true and the selling chapter 7 trustee confirmed the sale did close shortly after court approval. Counsel's additional argument that the sale cannot close due to a pledge of the membership interest to a third party that he did not know about at the time of sale approval is nonsensical. First, Lundgren knew of the pledge at the time sale approval was sought for the purchase. The third party filed an objection. Lundgren decided to buy the interest anyway. Second, the third party has not exercised its pledge. Lundgren is controlling SBC by paying its employees, negotiating on its behalf with NatGrid and refusing to pay its vendors. (Deines Decl. ¶ 16.)

[3] The hotel is heated by two sources. Rooftop units ("RTUs") heat the common areas of the hotel. The hot water previously heated by SBC, heats the hotel rooms and the commercial office space. The cold water cooled by SBC, provides air conditioning. The water itself is provided by the Town of Southbridge and is then recirculated in boilers.

hotel for heat. (*Id.* ¶ 21.) SBC has been in default under its power purchase agreement (the "PPA") with Debtor's hotel ever since. (*Id.*)

9. Lundgren knew of the SBC/Debtor above market PPA (the markup is anywhere from 24.2% to 26.2%) and defaults thereunder by SBC when he purchased SBC's equity interest. (*Id.*) Instead of terminating the oppressive PPA between Debtor and SBC, like he did for his building at 15 Wells just months before, Lundgren began demanding payments, at the above-market rate, from Debtor's hotel and threatening to shut off the power. (*Id.*) SBC also defaulted on its ground lease despite receiving over $320,000 per year in revenue for providing water to the nearby Millennium power plant. (*Id.* ¶ 23.) It is currently unknown where that money was diverted to and an investigation will be needed. (*Id.*) Lundgren is clearly keeping the PPA between Debtor and SBC in place to make a profit through SBC. He also controls the value of Debtor through the PPA. If he turns off electricity to Debtor, Debtor's value would go to $0. He cannot act in good faith on behalf of Debtor, who should reject the PPA and any related territory agreement and has claims against SBC with respect thereto.

10. Lundgren also purchased equity interests in Southbridge Associates II LLC ("SAII") in July 2026. (*Id.* ¶ 17.) SAII is the account holder on the power agreement with NatGrid for the provision of power to Debtor and the remaining campus. (*Id.*) SAII defaulted on the NatGrid contract and, instead of paying the amounts owed to NatGrid after his purchase, Lundgren filed bankruptcy for SAII last month (Bankr. D. Mass. Case No. 26-41128-EDK). (*Id.*) Moreover, NatGrid does not determine the cost of energy owed by each occupant of the park; that amount is determined by Lundgren, on behalf of SBC. (*Id.*) This is highlighted by long time lack of a separate meter for the 5 Optical building, which sits next to the hotel and the fact that the hotel is supplying 5 Optical with power for its sanitary lift station without compensation. (*Id.*) Given Lundgren's

multiple ownership interests of various parties that are obligated to pay for power, he cannot act in good faith on behalf of each of them.

11. In addition to Lundgren's blatant conflicts of interest, there is no equity in X-Caliber's collateral and there is no reasonable likelihood of reorganization for Debtor. Debtor owes X-Caliber over $14.4 million. (*Id.* ¶ 14.) Using the $11.8 million valuation of Debtor's Real Estate, the highest valuation known to X-Caliber at this time, and Debtor's $1.03 million cash balance at the beginning of the current cash collateral budget, X-Caliber's deficiency claim is in excess of $1.6 million. There is no equity.

12. According to Debtor's cash collateral motion, its unsecured creditors total approximately $1.56 million. Debtor's list of its top 20 unsecured creditors discloses that, once insiders are removed, the total unsecured claims are approximately $206,000, of which $185,000 is owed to the insider manager of the hotel—Shaner Hotel Holdings Limited Partnership ("Shaner"). There are no other non-insider classes of creditors known to X-Caliber.

13. Debtor has not provided a valuation of its assets. The offer to purchase the assets from Lundgren prior to the bankruptcy filing was $5 million. Debtor admits it is operating at a loss and cannot satisfy its debt service obligations to X-Caliber. Debtor claims it will be able to operate profitably by reducing and restructuring X-Caliber's claims. But Debtor cannot confirm a plan without the support of X-Caliber, its fulcrum secured creditor, with a lien on all of Debtor's assets and whose deficiency claim will control the vote of any unsecured creditor class.

14. Even if Debtor could confirm a plan, it still cannot overcome the reality that Debtor's business is not viable, particularly when saddled with the above-market PPA. Such fact is confirmed by its proposed budget showing Debtor, having just exited its "peak" season, rapidly burning through all of the cash it supposedly accumulated, even without making any payments on

X-Caliber's debt or any accruals for estate professionals' fees and chapter 11 expenses and with no end to Debtor's "slower" season in sight. As a result, the estate will suffer continuing and compounding losses and diminution throughout this case—losses and diminution for which Debtor cannot give X-Caliber adequate protection.

15. Chapter 11 was not intended to be a means by which frustrated equity can impair the claims and interests of a debtor's secured creditors for equity's personal benefit. The Bankruptcy Code protects secured creditors from unjustifiable erosion of their security by mandating stay relief where the debtor has no equity in the collateral and there is no viable reorganization. The Bankruptcy Code also does not force secured creditors to stand idly by without adequate protection while equity drives down the value of their collateral and uses their cash in order for equity to acquire such collateral for themselves. These protections and the Bankruptcy Code's priority scheme must be enforced.

16. The record already establishes multiple grounds on which X-Caliber is entitled to immediate relief from the automatic stay and multiple bases on which Debtor's case must be promptly dismissed. *The interests at stake in this case cannot survive delay.* Every day that goes by, Debtor risks SBC shutting down and not providing power and the bidders that were ready to bid at the foreclosure sale finding alternative investments that are not tied up in a lengthy bankruptcy process. Debtor also risks losing its income stream due to the uncertainty experienced by its office tenants and potential conference sponsors. The sale should be permitted as soon as possible to bring stability to the hotel operations and maximize value. The continued sale date is November 10, 2026 and permitting the sale to go forward at that time is the most effective resolution of this matter.

17. Experience teaches that the administrative burden of a case like Debtor's will quickly consume whatever value exists in the estate, drain all of the current cash collateral, and lose interested buyers who move on to other opportunities given the time value of their capital. Delay will simply destroy the only possibility that now exists for a positive outcome for secured and unsecured creditors alike, as well as for Debtor's business and the employees working at Debtor's hotel and tenants of the office space (which include several Massachusetts state agencies). (Deines Decl. ¶ 9.) Their interests cannot be made subordinate to Lundgren and his scheme to consolidate for himself 100% of the value of Debtor's business at the expense of all other parties in interest. The only party without risk in this case is Lundgren himself.

## BACKGROUND

### A. X-Caliber's Loan to Debtor.

18. On November 17, 2022, X-Caliber provided a $13,250,000 loan (the "Loan") to Debtor pursuant to a Loan Agreement of the same date (the "Loan Agreement"). The Loan was to be used, *inter alia*, to refinance existing debt owed by Debtor. (Loan Agreement § 5.05.) A true and correct copy of the Loan Agreement is attached as **Exhibit A** to the First Deines Declaration.[4]

19. To secure the Loan, Debtor executed a Mortgage, Fixture Filing, Security Agreement and Assignment of Leases and Rents dated as of November 17, 2022 (the "Mortgage"), with respect to the real property known as the Wellsworth Hotel, located at 14 Mechanic Street, Southbridge, Massachusetts (the "Real Estate"), which was recorded with the Worcester South District Registry of Deeds. The "Mortgaged Property" subject to X-Caliber's mortgage and security interest thereunder included (a) the Real Estate, (b) all "Collateral," including, *inter alia*,

[4] The "First Deines Declaration" refers to the *Declaration of Jeff Deines in Support of X-Caliber Rural Capital, LLC'S (I) Objection to Debtor's Emergency Verified Motion for Order Authorizing Use of Cash and Non-Cash Collateral and (II) Demand for Adequate Protection* [Docket No. 28].

all accounts, accounts receivable, contract rights, general intangibles, profits, rents, and revenues relating to the Real Estate, (c) all "Leases" and "Rents," including, *inter alia*, all rents, income, receipts, revenues, security deposits, escrow accounts, reserves, issues, profits, awards and payments of any kind derived from the Real Estate, and (d) all proceeds. (Mortg. §§ 1.1–1.2, 2.1, 9.1.) Debtor also granted X-Caliber an absolute and unconditional assignment of all Leases and Rents under the Mortgage. (Mortg. § 10.1.) The Mortgage also constituted a security agreement with respect to all of Debtor's Collateral, Leases, and Rents, as well as its "Fixtures." (Mortg. § 9.1.) A true and correct copy of the Mortgage is attached as **Exhibit B** to the First Deines Declaration.

20. Debtor also entered into a Security Agreement dated as of November 17, 2022 (the "Security Agreement"), granting X-Caliber a security interest in substantially all of Debtor's assets, including, *inter alia*, all accounts, deposit accounts, general intangibles, money, cash, cash equivalents, and proceeds. (Security Agreement §§ 1(c)(i), 2.) Thus, all of Debtor's cash not only is X-Caliber's original collateral, but constitutes proceeds of X-Caliber's other collateral. On or about November 15, 2022, X-Caliber filed a UCC-1 Financing Statement (the "UCC-1") perfecting its first-priority security interest in Debtor's assets with the Delaware Secretary of State. A true and correct copy of the Security Agreement and the UCC-1 are attached as **Exhibit C** and **Exhibit D**, respectively, to the First Deines Declaration.

21. Debtor, as owner, and Shaner, as manager, entered into a Hotel Management Agreement dated as of November 17, 2022 (the "Management Agreement"). The Management Agreement provides for the operation of Debtor's hotel by Shaner. Under the Management Agreement, Shaner is "agent of Debtor" with respect to Debtor's revenues, bank accounts, and all other funds used in operating the hotel. (Mgmt. Agreement § 9.1.) The Management Agreement

requires Shaner to deposit "all funds received by [Shaner]" from operating the hotel into segregated "Agency Accounts" bearing the hotel's name. (*Id.*) A true and correct copy of the Management Agreement is attached as Exhibit B to the Tri-Party Agreement (defined below).

22. Debtor and Shaner also entered into a Tri-Party Agreement with X-Caliber dated as of November 17, 2022 (the "Tri-Party Agreement"). Under the Tri-Party Agreement:

a. Debtor Pledges Management Agreement to X-Caliber. Debtor pledged all of its right, title, and interest in the Management Agreement to X-Caliber, including all proceeds and all accounts Debtor or its agents maintain in connection with the Management Agreement. (Tri-Party Agreement § 2.1.)

b. Shaner Collects Revenues in Trust for X-Caliber. The parties agreed that all revenues derived from operating the hotel shall (i) be "collected as trust funds," (ii) be deposited into a designated operating account, (iii) be transferred into the operating account or any payroll or permitted reserve accounts solely "in accordance with the . . . budgets most recently approved by [X-Caliber]," (iv) "remain trust funds for [X-Caliber] as collateral for the Loan until paid over to payees or otherwise disbursed in accordance with the provisions of the Management Agreement, subject to the Loan Agreement," and (v) "continue" to be held by Shaner "for the benefit of and at the direction of [X-Caliber]" following any notice of default by Debtor of its obligations to X-Caliber. (Tri-Party Agreement §§ 6.2(a), (b), (f).)

c. Shaner Fees Subordinated to X-Caliber Loan. Shaner subordinated its rights under the Management Agreement to receive fees and other amounts to Debtor's obligations to X-Caliber. (Tri-Party Agreement § 6.1.)

d. Shaner Agrees to Perform Applicable Loan Agreement Provisions. Shaner "agree[d] that it shall observe and perform the provisions of the [Tri-Party] Agreement and the [Loan Agreement and the other] Loan Documents relating to the operation of the Hotel, in the same manner as if those provisions were incorporated in the Management Agreement." (Tri-Party Agreement § 5.2(b).)

A true and correct copy of the Tri-Party Agreement (including the Management Agreement) is attached as **Exhibit E** to the First Deines Declaration.

23. Debtor failed to make its monthly payments to X-Caliber starting in February 2026. (Deines Decl. ¶ 20.)

24. Following events of default under the Loan Agreement and in light of Debtor's declining revenues and occupancy numbers, X-Caliber sought to exercise its secured creditor rights and remedies. Accordingly, X-Caliber instituted proceedings to foreclose on the Real Estate and conduct a UCC Article 9 sale of its other collateral. (Deines Decl. ¶ 10.) The foreclosure and Article 9 sale were scheduled for October 7, 2026. (*Id.*) These proceedings were the culmination of intense and extensive marketing. (*Id.* ¶ 11.) Multiple parties were set to participate in the foreclosure auction and engage in competitive bidding. (*Id.*) Lundgren sought to purchase Debtor's Real Estate for a steeply discounted $5 million purchase price with financing from X-Caliber and without a competitive auction. (*Id.* ¶ 12.) X-Caliber rejected the offer. (*Id.*)

25. X-Caliber obtained an appraisal of its collateral in September 2026. A true and correct copy of the appraisal is attached as **Exhibit F** to the Deines Declaration. The appraisal provided two valuations—one with the current PPA with SBC and one without. With the current PPA, the appraised value was $5,800,000. Appraisal, at A-2. Without the PPA, the appraised value was $11,800,000. *Id.* Notably, if SBC were to shut off power before Debtor obtains power from NatGrid, the value would go to $0. (Deines Decl. ¶ 18.)

26. As set forth in the Appraisal:

> [T]he hotel has historically incurred utility expenses ranging from 27.7% to 31.2% of total revenues, which are significantly higher than industry standards of 3.5% to 5%. The continued payment of above-market utility costs erodes the profitability of the subject property and has caused difficulties with debt service repayment. In April 2026, a hot water pipe at the property ruptured, requiring the installation and continued use of a temporary boiler to provide hot water and related thermal service to the hotel.

Appraisal, at A-10.

**B. The Chapter 11 Case Filing.**

27. Debtor filed this chapter 11 case on October 6, 2026 (the "Petition Date"), the eve of the foreclosure sale (without giving prior notice, knowing parties were coming from out of state

for the sale and causing many to incur unnecessary costs). (Deines Decl. ¶ 13.) As Debtor has expressly acknowledged, it filed this case in order to stop X-Caliber from completing its scheduled October 7 foreclosure on the Real Estate. (Cash Collateral Mot. ¶ 11.) Debtor's filing also stayed X-Caliber's Article 9 sale. (Deines Decl. ¶ 10.) The sale would have closed by now but for the bankruptcy filing. (*Id.*)

28. Debtor filed its Cash Collateral Motion on October 8, 2026, requesting authority to use X-Caliber's cash collateral without X-Caliber's consent and without offering X-Caliber legitimate adequate protection. (*See* Docket No. 17.) X-Caliber filed its Cash Collateral Objection on October 12, 2026. At the first day hearing on October 13, 2026, that Lundgren did not attend, the Court authorized Debtor to use X-Caliber's cash collateral and directed Debtor to file a reconciled budget and a revised proposed order consistent with remarks made during the hearing. (*See* Docket No. 30.)

29. On October 16, 2026, the Court entered an *Order Authorizing Interim Use of Cash Collateral and for Adequate Protection Therefor* [Docket No. 37] (the "Interim Cash Collateral Order"). The order attached an updated cash collateral budget (the "Budget") that added line items for professionals' fees (including legal and consulting fees) in an aggregate amount throughout the 13-week Budget period of $39,000. A continued hearing on cash collateral is scheduled for October 29, 2026.

30. According to Debtor's Cash Collateral Motion, its unsecured creditors total approximately $1.56 million. Debtor's list of top 20 unsecured creditors discloses that, once insiders are removed, the total unsecured claims are approximately $206,000, of which $185,000 is owed to the insider manager of the hotel—Shaner.

31. Debtor has not provided a valuation of its assets.

**C. Lundgren's Conflicts of Interest.**

32. In April 2026, when Lundgren learned that SBC's contract with one of his buildings on the campus, 15 Wells, was structured for above market rates, he orchestrated a termination of that power contract to his benefit. *See* Termination Agreement (attached as **Exhibit H** to the Deines Declaration). Lundgren has since hooked 15 Wells up to NatGrid directly and does not obtain electricity from SBC. (Deines Decl. ¶ 22.) One of Lundgren's other buildings, 5 Wells, still needs SBC to operate and provide it power. (*Id.*) X-Caliber understands that the 5 Wells building is subject to a triple net lease whereby the tenant, instead of Lundgren, pays for the electricity. (*Id.*)

33. In July 2026, Lundgren purchased the equity interests of twelve entities affiliated with Debtor for a total of $35,000; two of those twelve include the upstream equity holders of Debtor. (Deines Decl. ¶ 15.) Lundgren did not purchase the equity interests of Debtor directly. (*In re Charles Norton*, Case No. 25-11271 (Bankr. D. Mass) (Bostwick, J.), ECF Nos. 259, 316, 318 and 342; Deines Decl. ¶ 15.)

34. Lundgren had originally intended to purchase SBC with the other affiliates in July. (Deines Decl. ¶ 16.) However, at that time, CBS-FS, LLC objected to the sale because it held a pledge of Norton's membership interests in SBC. (*Norton*, *supra*, ECF No. 285). Lundgren withdrew the original request to purchase the SBC equity interests in July 2026. (*Norton*, *supra*, ECF No. 285). Then, with full knowledge of the pledge to CBS-FS, LLC and knowing that X-Caliber was preparing to foreclose on the hotel, Lundgren purchased the equity interests of SBC in September 2026 for $10,000. (*Norton*, *supra*, ECF No. 364, 376). While Lundgren's counsel informed the Court at the first day hearings that Lundgren has not closed on the purchase, Norton's chapter 7 trustee has confirmed that the sale closed. Moreover, there is no evidence that CBS-FS, LLC has exercised its pledge of Norton's SBC membership interests.

35. Around the same time Lundgren reached a termination of the SBC agreement with 15 Wells, SBC had an equipment malfunction that prevents it from providing hot water to the hotel for heat. (Deines Decl. ¶ 21.) SBC has been in default under its PPA with the hotel ever since. (*Id.*) Lundgren, as owner of SBC and the hotel, is conflicted due to the claims between the parties.

36. Lundgren also purchased equity interests is SAII in July 2026. (*Id.* ¶ 17.) SAII is the account holder on the power agreement with NatGrid for the provision of power to Debtor and the remaining campus. (*Id.*) SAII defaulted on the NatGrid contract and, instead of paying the amounts owed to NatGrid after his purchase, Lundgren filed bankruptcy for SAII last month in this district (Case No. 26-41128-EDK). (*Id.*) Moreover, NatGrid does not determine the cost of energy owed by each occupant of the park; that amount is determined by Lundgren, on behalf of SBC. (*Id.*) This is highlighted by long time absence of a separate meter for the 5 Optical building, which sits next to Debtor's hotel and the fact that the hotel is supplying 5 Optical with power for its sanitary lift station without compensation. (*Id.*) Given Lundgren's multiple ownership interests of various parties that are obligated to pay for power, he cannot act in good faith on behalf of each of them.

## ARGUMENT

### I. X-CALIBER IS ENTITLED TO STAY RELIEF BECAUSE DEBTOR DOES NOT HAVE ANY EQUITY IN X-CALIBER'S COLLATERAL OR A VIABLE PATH TO REORGANIZATION.

#### A. Information Required Pursuant to Local Rule 4001-1(a)(3).

37. In accordance with Local Rule 4001-1(a)(3), in support of its request for relief from the automatic stay pursuant to sections 362(d)(1) and (2), X-Caliber asserts as follows:

| **Local Rule** | **Response** |
| --- | --- |
| MLBR 4001-1(a)(3)(A):<br>The amounts and priority of the debt alleged to be owed to the moving party. | Debtor owes X-Caliber no less than the following amounts (plus all fees and costs, including attorneys' fees, in an amount to be determined):<br>Principal $12,712,241.35<br>Interest* $727,822.30<br>Default Interest* $1,005,538.29<br>Late Fees* $30,334.18<br>***Total*** ***$14,475,936.12***<br>(Deines Decl. ¶ 14.)<br>** Denotes amount owed through September 30, 2026.*<br>The foregoing amounts constitute (1) a first-priority, secured claim to the extent of the value of the collateral, (2) a superpriority adequate protection claim for the diminution in the value of the collateral since the Petition Date, and (3) an unsecured deficiency claim for the balance of the debt. |



159505060

<table>
<tr><td>MLBR 4001-1(a)(3)(B):<br><br>The identification, amount, and priority of each other encumbrance affecting the property, including real estate taxes and other municipal charges.</td><td>The title report provided to X-Caliber as of September 11, 2026 shows that X-Caliber's Mortgage is the only encumbrance filed against the Real Estate. A true and correct copy of the title search is attached to the Deines Declaration as Exhibit G-1.<br><br>The municipal lien certificates dated as of September 21, 2026 identify $163,294.75 and $697.88 in real estate taxes due for 2027 and $167,518.62 and $725.88 in real estate taxes due for 2026. True and correct copies of the lien certificates are attached to the Deines Declaration as Exhibit G-2.</td></tr>
<tr><td>MLBR 4001-1(a)(3)(C):<br><br>The total of the amounts set forth in subsections (A) and (B).</td><td>The total is calculated as follows:<br><br>X-Caliber $14,475,936.12<br>Other Encumbrances $332,237.13<br>Total $14,808,173.25</td></tr>
<tr><td>MLBR 4001-1(a)(3)(D):<br><br>The fair market value and liquidation value of the collateral, with any available appraisal attached.</td><td>X-Caliber obtained an appraisal of the Real Estate; furniture, fixtures, and equipment; and business enterprise value. The appraisal provided valuations under two different sets of assumptions. The appraisal was as of September 10, 2026, and is attached as Exhibit F to the Deines Declaration.<br><br>The first scenario resulted in a lower valuation assuming Debtor continued operating under its above-market PPA.<br><br><u>Real Estate</u><br><br>Fair Market Value: $5,300,000<br>Orderly Liquidation: $4,700,000<br>Forced Liquidation: $4,500,000<br><br><u>Furniture, Fixtures, and Equipment</u><br><br>Fair Market Value: $500,000<br>Orderly Liquidation: $500,000<br>Forced Liquidation: $400,000<br><br>(Appraisal, at 1–2, A-2.)</td></tr>
</table>

<table>
<tr>
<td></td>
<td>The second scenario resulted in a higher valuation assuming Debtor shed the above-market PPA.<br><br><u>Real Estate</u><br><br>Fair Market Value: $10,800,000<br>Orderly Liquidation: $9,700,000<br>Forced Liquidation: $9,100,000<br><br><u>Furniture, Fixtures, and Equipment</u><br><br>Fair Market Value: $1,000,000<br>Orderly Liquidation: $900,000<br>Forced Liquidation: $900,000<br><br>(Id.)<br><br>Under each scenario, Debtor’s business enterprise value appraised at zero under any valuation method. (Id.)<br><br>Based on the Budget, Debtor’s opening cash balance is as follows:<br><br>Cash (as of<br>October 9, 2026): $1,031,892.38</td>
</tr>
<tr>
<td><u>MLBR 4001-1(a)(3)(E)</u>:<br><br>Either that (i) there is no other collateral securing the obligation, or (ii) there is other collateral securing the obligation, indicating the identity, value, and valuation method and attaching any available appraisal.</td>
<td>X-Caliber’s liens and security interests encumber substantially all of Debtor’s real and personal property. X-Caliber requests stay relief to exercise its rights and remedies against all such assets. X-Caliber is unaware of any other assets of Debtor (or valuations other than the Appraisal).</td>
</tr>
</table>



159505060

| | |
|---|---|
| MLBR 4001-1(a)(3)(F):<br>The original holder of the obligations secured by the security interest or mortgage and every subsequent transferee, if known to the moving party, and whether the moving party is the holder of that obligation or an agent of the holder. | X-Caliber is the original holder of the obligations secured by its mortgage and security interests. |
| MLBR 4001-1(a)(3)(G):<br>If known to the moving party, whether and where any declaration of homestead has been recorded against the property. | Unknown/not applicable. |

38. X-Caliber reserves the right to supplement or amend the foregoing information prior to or at any hearing on this Motion to the extent further information becomes available.

**B. X-Caliber Is Entitled to Relief from the Automatic Stay Under Section 362(d)(2) Because Debtor Has Neither Any Equity in X-Caliber's Collateral Nor Any Reasonable Likelihood of Reorganizing.**

39. Section 362(d)(2) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay with respect to an act against property if "(A) the debtor does not have an equity in such property" and "(B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). "The party seeking relief from the automatic stay bears the burden of proof as to the debtor's equity in the collateral, 11 U.S.C. § 362(g)(1), and the opposing party bears the burden of proof as to all other issues in the matter, 11 U.S.C. § 362(g)(2)." *In re Ledis*, 259 B.R. 472, 475 (Bankr. D. Mass. 2001). Accordingly, "[a]s the moving party," X-Caliber need only show "Debtor's lack of equity" in its collateral and Debtor must show that it is "necessary for an effective reorganization." *Mercado v. Combined Invs., LLC (In re Mercado)*, 523 B.R. 755, 761 (B.A.P. 1st Cir. 2015).

40. To satisfy its burden, Debtor must show both that "the property is necessary to enable [Debtor] to reorganize" and "an effective reorganization is in prospect." *Id.* at 762. As the

Supreme Court has explained, with respect to the first element, "[w]hat this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be *needed* for it; but that the property is *essential*." *Id.* (emphasis added) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988)). With respect to the second element, for a reorganization to be "in prospect," Debtor must have "a reasonable possibility of a successful reorganization within a reasonable time." *Id.* (quoting *Timbers of Inwood Forest Assocs.*, 484 U.S. at 375–76).

41. The Bankruptcy Appellate Panel of the First Circuit has cited the following "list of requirements that a debtor should show in order to meet its burden under § 362(d)(2)(B)":

> 1. The debtor must be moving meaningfully to propose a plan;
> 2. The plan must provide that the lender's allowed secured claim would be valued and payable from the debtor's net operating income generated by its property or the ability to propose a plan based on the infusion of new capital, sale, or other viable means;
> 3. The plan must have a realistic chance of confirmation;
> 4. Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;
> 5. The reorganization must occur in a reasonable period of time. In this regard the factors to look at are:
>     a. the negotiations among the parties;
>     b. the amount of time that the debtor has been in possession and operating the business;
>     c. the length of time since the expiration of the exclusivity period.

*Id.* at 762–63 (quoting *In re SW Boston Hotel Venture, LLC,* 449 B.R. 156, 179 (Bankr. D. Mass. 2011)). "The list is illustrative, not exhaustive, and the factors are meant to provide an outline of considerations." *Id.* at 763.

42. Applying this test, courts have granted stay relief in similar cases. In *Mercado*, the Bankruptcy Appellate Panel affirmed a grant of stay relief where the bankruptcy court determined the debtor failed to show three properties she rented to various tenants were necessary to an effective reorganization that was in prospect. Other than testimony concerning the monthly net income the property generated, "she did not provide any further information about the [p]roperty, its condition, how she expected to maintain full occupancy . . . going forward, or how she would handle any major expenses." *Id.* "Nor did the [d]ebtor offer any testimony regarding payment of debt service" on her secured mortgage debt owed to the movant. *Id.* Thus, "the bankruptcy court determined the on-going expenses and debt service expense for the [p]roperty exceeded the amount of rental income it generated and excess income would not be available from the [p]roperty to fund the [d]ebtor's reorganization plan." *Id.* The debtor also did not "provide the bankruptcy court with any kind of outline of a potential reorganization plan, or explain how such a plan would treat [her mortgage lender's] secured and unsecured claims."[5] *Id.* at 764. The panel therefore affirmed.

43. Stay relief is granted in recently filed cases, such as this case. For example, this Court has granted stay relief to permit a debtor's secured lender to foreclose on four of the debtor's properties early in its case where the debtor did not "indicate how it could refinance its assets to satisfy its outstanding obligations and reorganize its financial affairs." *In re BB Island Cap., LLC*, 540 B.R. 16, 23 (Bankr. D. Mass. 2015), *aff'd*, Civ. A. No. 15-13105, 2015 WL 8512862 (D. Mass. Dec. 11, 2015). The bankruptcy court made such determination, "*[e]ven if* this Court were to adopt [a] lenient standard applicable to the burden of proof." *Id.* (emphasis added) (citing *In re Souza*, Case No. 12-13341, 2012 WL 8441318, at *3 (Bankr.E.D.Ca. Nov. 26, 2012)).

---

[5] The panel also stated that "there was no proposed plan of reorganization pending" at the time of the bankruptcy court's hearing on remand, held more than two years after the commencement of the case after the panel had vacated an earlier grant of stay relief. *Mercado*, 523 B.R. at 764.

44. Both elements required for stay relief under section 362(d)(2) are satisfied.

45. ***Debtor Has No Equity in X-Caliber's Collateral.*** Under any valuation method, Debtor is under water. Even using the *high-end scenario* of the fair market valuation from X-Caliber's appraisal, which assumes Debtor rejects its above-market PPA, Debtor's Real Estate ($10,800,000), furniture, fixtures, and equipment ($1,000,000), and cash balance *at the beginning* of the current cash collateral Budget ($1,031,892.38), total only $12,831,892.38. (Deines Decl. ¶ 19.) In comparison, the obligations secured by such collateral totaled no less than $14,475,936.12 as of the Petition Date. (*Id.*) Thus, even using the most favorable projections to Debtor, it is still under water by more than $1,644,043.74. There is no evidence in the record showing a receivables balance (or collectability) that would give Debtor any equity. X-Caliber is presently unaware of any other collateral that could bridge the gap. (*Id.*)

46. The numbers are far worse under the more likely scenario (given Lundgren's interests and control) where Debtor does not reject its PPA and continues paying its insider above-market rates for power. Under that scenario, the fair market value of Debtor's Real Estate ($5,300,000) and furniture, fixtures and equipment ($500,000) are substantially reduced (Appraisal, at 1–2, A-2), and by the end of Debtor's Budget its total cash ($380,362.55) will be less than half of its present balance (Interim Cash Collateral Order, at 7), for an aggregate value of $6,180,362.55. Thus, X-Caliber's claim will likely be almost, if not more than double the value of its collateral by the end of the current Budget. Moreover, if Lundgren shuts off electricity to the hotel, the value will go to $0. (Deines Decl. ¶ 18.) Lundgren has every incentive to destroy the value of the hotel to enrich himself. Accordingly, the first element of section 362(d)(2) is plainly satisfied.

47. ***Debtor Has No Reasonable Prospect of Reorganizing.*** Debtor will not be able to satisfy its burden of proof under section 362(d)(2). The factors cited in *Mercado* weigh against Debtor even assuming *arguendo* it is meaningfully moving to propose a plan (factor 1) and such plan will not be "obviously unconfirmable" (factor 4).

48. Debtor has admitted it cannot service its debt to X-Caliber from its operating income or otherwise (factor 2) and has not explained how that will change. To date, Debtor has stated only that it will "reduce and restructure" X-Caliber's secured debt and "increase[] marketing" of its hotel and office space. But such conclusory statements cannot satisfy Debtor's burden (and are contradicted by Debtor's admission that it just exited its "peak" season and entered its "slower" season). *See, e.g.*, *Mercado*, 523 B.R. at 765 (stating that "[a] debtor's burden under this prong of § 362(d)(2)(B) cannot be fulfilled by merely manifesting unsubstantiated hopes for a successful reorganization").

49. Further, no plan Debtor proposes has a "realistic chance" of being confirmed (factor 3) without X-Caliber's support. X-Caliber is Debtor's only known secured lender. (Cash Collateral Mot. ¶¶ 8–9.) Thus, since X-Caliber is undersecured, it may make an election under section 1111(b) entitling it to retain 100% of the value of its collateral under the plan. 11 U.S.C. § 1129(a)(7)(B). If X-Caliber made such election, X-Caliber would have a lien and secured claim equal to 100% of the *amount* of its claim.[6] Thus, even in the cramdown context, X-Caliber would be entitled under section 1129(b)(2)(A) to (i) retain its liens and receive deferred cash payments not only equal to the value of its interest, but "totaling at least the allowed amount of [its] claim,"

---

[6] "When the section 1111(b) election is made . . . the secured creditor waives its deficiency claim for the right to have a lien on the collateral equal to the full amount of its allowed claim. Thus, a creditor owed $100 secured by collateral worth $50 who elects under section 1111(b) would have an allowed claim of $100 secured by a lien on the collateral of $100." 7 *Collier on Bankruptcy* ¶ 1129.02[7][d] (Richard Levin & Henry J. Sommer eds., 16th ed. 2026).

(ii) a lien on the proceeds of the sale of its collateral, or (iii) the "indubitable equivalent" of its claim. *Id.* § 1129(b)(2)(A). Given Debtor's admission that it cannot currently service its debt to X-Caliber, no plan subject to such requirements would be feasible without selling the collateral, even if there was somehow an accepting impaired class without including insider votes.

50. Any plan Debtor proposes would not have a realistic chance of being confirmed even if X-Caliber did not make a section 1111(b) election. X-Caliber's deficiency claim would be significant, as discussed above.[7] As a result, X-Caliber would control the unsecured creditor vote after excluding the votes of insiders. Indeed, while Debtor asserts it has approximately $1.56 million of trade debt (Cash Collateral Mot. ¶ 10), the known, liquidated amount of its top-20 non-insider creditors totals only approximately $206,000, approximately $185,000 of which is owed to Shaner (*see* Docket No. 11), which Debtor asserts is actually a minority equity owner of Debtor (Cash Collateral Mot. ¶ 7 n.1). Any unsecured creditor class therefore would not be accepted by at least two-thirds in amount of unsecured claims as required under section 1126(c), rendering the plan unable to satisfy section 1129(a)(10).

51. Accordingly, like the creditors in *Mercado* and *BB Island Capital*, X-Caliber is entitled to relief from the automatic stay under section 362(d)(2). Debtor has no equity in X-Caliber's collateral and Debtor does not have a reasonable likelihood of reorganizing. Under such circumstances, Debtor's case has already served Lundgren's admitted purpose: to delay X-Caliber. The Bankruptcy Code does not permit Lundgren to indefinitely stay X-Caliber's rights and remedies where doing so does not and will not accomplish chapter 11's intended purposes.

---

[7] It is blackletter law that Debtor cannot classify any such deficiency claim of X-Caliber separately from other unsecured creditors in order to gerrymander an impaired accepting class. *See, e.g.*, *In re Cantonwood Assocs. Ltd. P'ship*, 138 B.R. 648, 655 (Bankr. D. Mass. 1992) ("The state law distinction between Code-created unsecured deficiency claims and other unsecured claims does not alone warrant separate classification." (quoting *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 948 F.2d 134, 140 (5th Cir. 1991)).

### C. X-Caliber Is Entitled to Relief from the Automatic Stay for Cause Under Section 362(d)(1) Because Its Interests in Its Collateral Are Not Adequately Protected.

52. Section 362(d)(1) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay to a party in interest "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1); *In re Everett*, Case No. 10-19457, 2013 WL 3757283, at *8 (Bankr. D. Mass. July 15, 2013). As stated above, Debtor bears the burden of proof as to all issues under section 362(g), other than its equity in the property. *Ledis*, 259 B.R. at 475 (citing 11 U.S.C. § 362(g)).

53. Accordingly, upon a creditor making a mere *prima facie* case under section 362(d)(1),[8] "it is incumbent on the [d]ebtor to prove [the creditor's] security interest is otherwise adequately protected." *Id.* at 476. If the debtor fails to show the creditor is adequately protected, the creditor "is entitled to relief as a matter of law." *See, e.g.*, *id.* at 476–77 (granting relief from the automatic stay where the creditor's "claim exceeds the value of the collateral and the [d]ebtor has not offered some other form of adequate protection"); *see also In re Biltwood Props. LLC*, 473 B.R. 70, 77 (Bankr. M.D. Pa. 2012) (granting relief under section 362(d)(1) where the creditor's "secured position [was] not adequately protected because of the existence of a superior tax lien"); *In re Planned Sys., Inc.*, 78 B.R. 852, 863 (Bankr. S.D. Ohio 1987) (granting relief under section 362(d)(1) where the collateral was declining in value and the debtor did not propose "compensation for, or protection against, the future decrease in value of the equipment").

---

[8] X-Caliber need not prove Debtor lacks any equity in its collateral for purposes of a section 362(d)(1) motion. *See, e.g.*, *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("[Section] 362(g)(1) does not require the secured creditor to prove lack of equity as part of its § 362(d)(1) motion for relief from the stay based on a lack of adequate protection. The debtor's lack of equity is an element of a § 362(d)(2) motion.").

54. As set forth in its Cash Collateral Objection, X-Caliber is not adequately protected.[9] (*See, e.g.*, Cash Collateral Obj. ¶¶ 20–37.) For example, there is no equity cushion to protect X-Caliber. This is comprehensively established by the foregoing analysis showing Debtor has no equity in the collateral. Additionally, the Budget shows immediate and significant erosion of X-Caliber's cash collateral, including at least a $129,285.04 loss in just the second week of the Budget and a net loss across the 13-week Budget period of $651,529.83. The real damage to X-Caliber's security would be even greater after factoring in the significant professionals' fees and other chapter 11 expenses that Debtor has either underestimated or omitted from its Budget entirely (and any retainers paid out of X-Caliber's cash prior to the bankruptcy filing). Debtor's operations will not cover such diminution, as already established by its admission that Debtor will not generate sufficient rents or receivables from the hotel to replace the cash it will burn through during this case. Accordingly, X-Caliber is not adequately protected, even by the replacement lien Debtor has granted to X-Caliber on post-petition assets that X-Caliber already has by virtue of its loan documents. *See, e.g.*, *In re Rivera Rosario*, Case No. 23-02291, 2023 WL 7449959, at *5 (Bankr. D.P.R. Nov. 9, 2023) (agreeing that "a lien on the same rents in which [the secured creditor] already has a lien does not qualify as adequate protection").

55. The foregoing establishes more than just a *prima facie* case that X-Caliber is not adequately protected. The burden therefore is on Debtor to establish that X-Caliber is adequately protected. Debtor cannot make such showing, thus X-Caliber is entitled to relief from the automatic stay under section 362(d)(1) as a matter of law. The Bankruptcy Code does not allow Lundgren to force X-Caliber to sit idly by while its collateral rapidly diminishes in value without

[9] For purposes establishing the lack of adequate protection is cause for relief from the automatic stay under section 362(d)(1), X-Caliber incorporates its Cash Collateral Objection as if fully set forth herein.

any protection. To the contrary, stay relief is mandatory to ensure X-Caliber's interests are preserved.

**D. Waiver of Stay Under Federal Rule of Bankruptcy Procedure 4001(a)(4).**

56. Based on the facts set forth herein, X-Caliber requests that the fourteen-day stay provided for in Federal Rule of Bankruptcy Procedure 4001(a)(4) be waived.

## II. DEBTOR'S CASE SHOULD BE DISMISSED FOR CAUSE BECAUSE THERE IS A SUBSTANTIAL AND CONTINUING LOSS AND DIMINUTION WITHOUT A REASONABLE LIKELIHOOD OF REHABILITATION.

### A. There is a Substantial and Continuing Loss to, and Diminution of, the Estate and No Reasonable Likelihood of Rehabilitation.

57. Section 1112(b) of the Bankruptcy Code provides "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment . . . of a trustee or an examiner is in the best interest of creditors and the estate."[10] 11 U.S.C. § 1112(b)(1). The Court can dismiss this case at any time. *See, e.g.*, *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) (stating "[c]reditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired").

58. Section 1112(b)(1)'s language is "mandatory" and "limit[s] the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause." *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (citing *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, Pub. L. No. 109-8, 119 Stat. 23 (2005)). Section

[10] A request for dismissal under section 1112(b) must be scheduled by the Court no later than thirty days after filing of the motion, and must be decided by the Court no later than fifteen days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits. 11 U.S.C. § 1112(b)(3).

1112(b)(4)'s examples of "cause" for dismissal are non-exhaustive. *Andover Covered Bridge, LLC*, 553 B.R. 162, 172 (B.A.P. 1st Cir. 2016).

59. Cause exists to dismiss or convert under section 1112(b)(4)(A) if there is a "substantial *or* continuing loss to *or* diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A) (emphasis added). "Courts have held that a debtor's post-petition negative cash flow and/or an inability to pay current expenses satisfies the [first prong] of [section] 1112(b)(4)(A)." *Andover Covered Bridge*, 553 B.R. at 174–75. "Rehabilitation," for purposes of the second prong of section 1112(b)(4)(A), asks "whether the debtor will be able to reestablish its business." *Id.* The rehabilitation analysis requires bankruptcy courts to "analyze if the causes for debtor's continuing losses can be corrected, and if the debtor or some other party in interest is capable or willing to perform the necessary remediation." *Id.* at 175.

60. The First Circuit has affirmed a bankruptcy court's finding of diminution without any likelihood of rehabilitation under analogous circumstances. For example, in *In re Hoover*, "the bankruptcy court's finding of diminution . . . was simple and straightforward: [the debtor] conceded that he was selling inventory without replacing it, and his monthly operating reports . . . showed insufficient profit to account for (or replace) the sold inventory. In short, the estate was diminishing." 828 F.3d 5, 9 (1st Cir. 2016). Likewise, the debtor's monthly operating reports "show[ed] insufficient cash flow to pay costs and debts. The [bankruptcy] court concluded: 'This debtor barely makes it. . . . and that's no recipe for a reorganization.'" *Id.* The bankruptcy court rejected the debtor's "testimony that he had plans for generating more income, finding those plans both speculative and optimistic." *Id.* at 10.



159505060

61. The Bankruptcy Appellate Panel of the First Circuit has also affirmed a finding of cause to dismiss under section 1112(b)(4)(A) under analogous circumstances. In *Andover Covered Bridge*, it flatly stated: "***A debtor who is unable to service its debt at the outset of the case and remains unable to do so for the foreseeable future does not have a reasonable likelihood of rehabilitation***." *Andover Covered Bridge*, 553 B.R. at 175–76 (emphasis added). The similarities between *Andover Covered Bridge* and this case are ***striking***. Indeed, the debtor in *Andover Covered Bridge* defaulted on its mortgage, "explained it commenced the bankruptcy to stay the foreclosure of the [mortgaged property]," a farm named Harvest Hills, and "admitted it would not be able to generate sufficient cash flow to service its debts, even after Harvest [Hills'] peak season." *Id.* at 166, 168, 176.

62. Likewise, Debtor has admitted it will operate at a loss during this case—even without making any regular principal or interest payments to X-Caliber. (Cash Collateral Mot. ¶17.c.) Such admission alone establishes that Debtor will suffer a continuing loss during this case—and the Budget shows such loss will be substantial ($651,529.83 by the end of the 13-week Budget). (Interim Cash Collateral Order, at 7.) Though, section 1112(b)(4)(A) does not require a loss to be both substantial and continuing; either is sufficient. 11 U.S.C. § 1112(b)(4)(A). As stated above, Debtor has also admitted it must both "reduc[e] and restructur[e] its secured debt" and increase its hotel and office occupancy numbers in order to "be able to operate with a positive cash flow." (*Id.* ¶ 12.) However, Debtor has not provided a substantive basis for its assumption that it will be able to increase occupancy, materially or otherwise. But even if it did, for the reasons set forth above, Debtor has no path to reducing and restructuring the secured debt it owes to X-Caliber in this case. Accordingly, Debtor plainly lacks any reasonable likelihood of rehabilitating.

63. That Debtor's business lacks viability is even clearer when considering the circumstances leading up to its filing. To reiterate: Debtor asserts that it just exited the peak season during which it "accumulated" cash in order to "sustain operating losses" it expects to suffer during this case. But Debtor has not paid any principal or interest to X-Caliber since February 2026. (Deines Decl. ¶ 20.) Debtor was not even able to pay its utility bills in the months before it filed this case. (*Id.*) That it was operating on such thin margins when it was supposedly operating at peak capacity and accumulating cash but could not service its debt or pay its utilities is damning. Worse, despite entering bankruptcy with such tailwinds, Debtor still admits it may need insider DIP financing merely to "insure continued operations" during this case. (Cash Collateral Mot. ¶ 17.c.) ***Compounding negative cashflows with a junior DIP on top of senior prepetition secured debt that Debtor already lacks any ability to service is a quick recipe for administrative insolvency***. Moreover, given that Lundgren has repeatedly asked X-Caliber for funds, it is highly unlikely that he can provide financing to Debtor.

64. Accordingly, cause plainly exists to dismiss or convert Debtor's case under section 1112(b)(4)(A) due to substantial and continuing losses to, and diminution of, the estate without a reasonable likelihood of rehabilitation. The longer this case remains in chapter 11, the worse the outcome will be for all stakeholders.

**B. Dismissal Is in the Best Interests of Creditors and the Estate.**

65. Upon determining that cause exists to dismiss or convert a case under section 1112(b), dismissal or conversion is mandatory.[11] *La Trinidad Elderly LP SE v. Loíza Ponce Holdings LLC (In re La Trinidad Elderly LP SE)*, 627 B.R. 779, 798 (B.A.P. 1st Cir. 2021). As a

[11] The only exception to mandatory dismissal or conversion is the "unusual circumstances" provision of section 1112(b)(2). 11 U.S.C. § 1112(b)(2). The burden of proof is on the debtor to establish such exception applies in any case. *La Trinidad*, 627 B.R. at 798.

result, the Court must then "determine which option is in the best interest of creditors and the estate." *Id.* Courts in the First Circuit typically consider the following factors to determine whether the best interest of creditors favors dismissal or conversion:

(1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2) Whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3) Whether the debtor would simply file a further case upon dismissal;

(4) The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

(5) Whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

(6) Whether any remaining issues would be better resolved outside the bankruptcy forum;

(7) Whether the estate consists of a "single asset";

(8) Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9) Whether a plan has been confirmed and whether any property remains in the estate to be administered; and

(10) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*E.g.*, *Efron v. Candelario (In re Efron)*, 529 B.R. 396, 413 (B.A.P. 1st Cir. 2015).

66. Here, such factors weigh in favor of dismissal. Nothing in the record demonstrates material preferential transfers that could be recovered, or material assets that could be reached, by a chapter 7 trustee for the benefit of unsecured creditors (factors 1 and 4). This Court has not granted any parties in interest material rights that must be preserved (factor 2). Dismissal will do more than conversion to maximize the estate's economic value, as such value is fully encumbered by X-Caliber's liens (factor 5). Further, X-Caliber is prepared to continue with the foreclosure and

sale efforts it was poised to complete when this case was filed, whereas a chapter 7 trustee would require unnecessary additional time and expense to market and liquidate Debtor's assets, for X-Caliber's primary benefit. To the extent any issues exist that are not mooted by X-Caliber's foreclosure upon and sale of its collateral, there is no material advantage to such issues being resolved in bankruptcy (to the contrary, conversion will needlessly multiply the expense of resolving such issues) (factor 6).[12] No chapter 11 plan has been confirmed (or even proposed) and the vast majority of the estate's value is the Real Estate, which (again) is fully encumbered by X-Caliber's mortgage lien (factors 7 and 9). X-Caliber is not aware of any other creditors who have alleged misconduct that requires redress in chapter 7 to protect their interests (factor 8). X-Caliber also is not aware of any environmental or safety concerns that require trustee supervision (nor should there be any following X-Caliber's foreclosure) (factor 10).

67. Another court in the First Circuit has also determined that similar grounds as exist in this case warrant dismissal rather than conversion. The bankruptcy court in *In re Horned Dorset Primavera, Inc.*, dismissed the debtor's case where it determined the debtor, *inter alia*, "does not have a profitable business operation around which to structure its reorganization effort," "has suffered and continues to experience a negative cash flow," and the debtor's real property "would remain encumbered with the two mortgage notes . . . leaving the . . . real estate asset under water." 606 B.R. 117, 155–57 (Bankr. D.P.R. 2019). Likewise, Debtor here has no equity in its real and personal property and has admitted it is not profitable and has negative cash flows.

---

[12] *See In re Inwood Heights Hous. Dev. Fund Corp.*, No. 11-13322, 2011 WL 3793324, at *12 (Bankr. S.D.N.Y. Aug. 25, 2011) (Glenn, J.) (finding that dismissal would be preferable to conversion of the debtor's chapter 11 in part because "[c]onversion would merely increase administrative costs with little attendant benefit to the estate and creditors").

68. Accordingly, the best interests of creditors plainly favor dismissal rather than conversion. Any other result would needlessly burden the estate with administrative expenses without any material benefit to X-Caliber or any other creditors.

**III. DEBTOR'S CASE SHOULD BE DISMISSED FOR CAUSE PURSUANT TO 11 U.S.C. § 1112(b) BECAUSE IT WAS FILED IN BAD FAITH.**

69. Alternatively, cause exists to dismiss this chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code as the record plainly establishes that Debtor filed this chapter 11 case in bad faith to delay X-Caliber's prepetition foreclosure and sale proceedings, discourage buyers who were interested in purchasing Debtor's assets at such proceedings, and allow Lundgren to acquire such assets at an extreme discount. Lundgren purchased Debtor's upstream equity interests to do just this.

70. "[T]here is a well-developed body of case law that holds that chapter 11 petitions can be dismissed for lack of good faith." *See, e.g.*, *La Trinidad*, 627 B.R. at 799 (affirming the bankruptcy court's decision dismissing the debtor's chapter 11 case as a bad faith filing). Indeed, "courts . . . have long recognized that bad faith constitutes 'cause' for purposes of dismissal . . . under section 1112(b) or relief from stay under section 362(d)(1)." *E.g.*, *In re 1701 Com., LLC*, 477 B.R. 652, 657 (Bankr. N.D. Tex. 2012). The right to move under section 1112(b) for mandatory dismissal or conversion of bad faith filings "***furthers the balancing process between the interests of debtors and creditors which . . . is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy***." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (emphasis added).

71. "While there is no single formulation of what constitutes lack of good faith (or bad faith), courts have concluded that the good faith determination involves a fact-intensive inquiry,"

which considers the totality of the circumstances. *La Trinidad*, 627 B.R. at 800–01. This Court has previously identified fourteen factors relevant to finding bad faith, including:

1. The debtor has few or no unsecured creditors;
2. There has been a previous bankruptcy petition by the debtor or a related entity;
3. The pre-petition conduct of the debtor has been improper;
4. The petition effectively allows the debtor to evade court orders;
5. There are few debts to non-moving creditors;
6. The petition was filed on the eve of foreclosure;
7. The foreclosed property is the sole or major asset of the debtor;
8. The debtor has no ongoing business or employees;
9. There is no possibility of reorganization;
10. The debtor's income is not sufficient to operate;
11. There was no pressure from non-moving creditors;
12. Reorganization essentially involves the resolution of a two party dispute;
13. A corporate debtor was formed and received title to its major assets immediately before the petition; and
14. The debtor filed solely to create the automatic stay.

*E.g.*, *In re Vill. Green Realty Tr.*, 113 B.R. 105, 115–16 (Bankr. D. Mass. 1990); *see also La Trinidad*, 627 B.R. at 801 (citing, *inter alia*, *Village Green Realty's* fourteen-factor test in support of *La Trinidad's* eight-factor test for bad faith in single asset real estate cases). Bad faith does not depend on the presence of all of these factors, nor are they exhaustive or to be "rigidly applied." *La Trinidad*, 627 B.R. at 801.

72. Although not in and of itself dispositive,[13] "***the inference of bad faith is particularly strong***" where a case is filed for obtaining protection from the automatic stay "on the eve of foreclosure." *See, e.g.*, *1701 Com.*, 477 B.R. at 658 (emphasis added) (finding bad faith where "[t]he Property had been posted for foreclosure, and Debtor filed bankruptcy on the eve of a hearing at which the TRO barring foreclosure might have been dissolved"). Indeed, "the filing of a bankruptcy petition merely to prevent foreclosure, without the ability or the intention to reorganize, is an abuse of the Bankruptcy Code." *In re Felberman*, 196 B.R. 678, 681 (Bankr. S.D.N.Y. 1995); *see also In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (dismissing a chapter 11 case where "[i]t is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic in its dispute with [its creditors]," in order to "relitigate" a judgment entered on the same day that the debtor filed its petition).

73. X-Caliber need only make a *prima facie* showing that Debtor did not file this case in good faith. *La Trinidad*, 627 B.R. at 800. After the movant satisfies the initial burden of making a *prima facie* showing of a lack of good faith in filing, the burden shifts to the debtor to demonstrate good faith. *E.g.*, *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 24 (1st Cir. 2007) (citing *In re Paolini*, 312 B.R. 295, 305 (Bankr. E.D. Va. 2004)).

74. The factors identified in *Village Green Realty* clearly weigh in favor of a bad faith determination. Debtor's overall unsecured debt, and its debt other than to X-Caliber, is hardly

[13] Courts in the First Circuit have recognized that filings made in response to impending foreclosures may often not be filed in bad faith. *E.g.*, *La Trinidad*, 627 B.R. at 800. However, even such courts still recognize that the filing of case to stay a foreclosure is nonetheless indicative of bad faith, for example, where the foreclosure is "as a result of arrearages or default on the debt" or "the debtor's financial condition is, in essence, a two[-]party dispute between the debtor and secured creditors which can be resolved in the pending state court foreclosure action." *See, e.g.*, *id.* (affirming the dismissal of the debtor's case filed on the eve of foreclosure).

material (factors 1 and 5). The known, liquidated claims on its top-20 non-insider creditors list total only approximately $206,000, or barely over $20,000 after excluding minority owner Shaner's claims (*see* Docket No. 11; Cash Collateral Mot. ¶ 7 n.1). Thus, it also appears that there was little if any pressure from non-moving creditors (factor 11). Rather, this case is essentially a two-party dispute (factor 12), given Debtor's claim that it will be able to successfully reorganize so long as it increases its marketing and reduces and restructures its secured debt, i.e., its debt to X-Caliber. (Cash Collateral Mot. ¶ 12.) Critically, Debtor referenced no other creditor relationship in need of restructuring in making such sweeping claim. But for the bankruptcy filing, the foreclosure sale would have already closed.

75. The transactions that Debtor's principal orchestrated shortly before the Petition Date are further evidence that this was a bad faith filing (factors 3, 6, 7, 13, and 14). That Debtor filed this case on the eve of X-Caliber's foreclosure and sale proceedings, for the express purpose of invoking the automatic stay to freeze those proceedings, is bad faith conduct. But it is not the only bad faith conduct. Lundgren's purchase of Debtor's affiliates, including the two equity holders of Debtor, before causing Debtor to file this case, and his attempt to buy Debtor's "major asset," its Real Estate, at X-Caliber's foreclosure sale for a steeply discounted purchase price with significant financing from X-Caliber and without an auction, is additional evidence of bad faith. (Deines Decl. ¶¶ 12, 15–16.) Lundgren only filed this case to stop the foreclosure and sale when his efforts to purchase the hotel from X-Caliber failed and X-Caliber was preparing to sell to third parties. (*Id.* ¶¶ 12–13.) Further, Lundgren still causes Debtor to pay above-market rates to SBC under its PPA,[14] even though SBC has breached its obligations thereunder by failing to provide

[14] For example, Debtor's total receipts across the first four weeks of the Budget are $675,302.36. In comparison, its utilities payment just to SBC for that period is $113,260.92, representing almost 17% of its total receipts. (Interim Cash Collateral Order, at 6–7.) Debtor's total utility payments for such Budget period are $204,033.92, meaning its utilities consume more than 30% of its revenue. As indicated in X-Caliber's appraisal, the industry standard

hot water to Debtor (requiring Debtor to purchase its own boilers and run temporary lines throughout the hotel). (*Id.* ¶ 21.) Surprisingly, Debtor and counsel opted not to disclose to this Court that Lundgren owns SBC, despite asking the Court to authorize Debtor to make exorbitant utility payments to SBC under Debtor's proposed budget. The foregoing establishes that Lundgren cannot be a fiduciary to Debtor in this case as he is hopelessly conflicted by his ownership of Debtor's key vendor-affiliates.

76. Other factors also support a bad faith determination. As discussed herein, Debtor's income is not sufficient to operate (factor 10) and it does not have a reasonable likelihood of confirming a plan (factor 9), and, on information and belief, Debtor has few employees of its own (factor 8), as Shaner operates the hotel and employees all hotel personnel (Docket No. 18 ¶ 7). Accordingly, 12 of the 14 factors establish bad faith. Cause therefore plainly exists to dismiss this case, and as set forth above, the best interests of creditors require dismissal.

## IV. THE COURT SHOULD BAR DEBTOR FROM RE-FILING WITHIN AT LEAST 180 DAYS AFTER THE CASE IS DISMISSED.

77. Given Debtor's admission that it filed this case to stay X-Caliber's foreclosure and sale proceedings, any order the Court enters dismissing this case should bar Debtor from re-filing within at least 180 days after dismissal. Section 349(a) of the Bankruptcy Code authorizes the Court to bar re-filing for cause. 11 U.S.C. § 349(a). Such cause plainly exists here. *See, e.g.*, *In re Fleury*, 294 B.R. 1, 9 (Bankr. D. Mass. 2003) (finding that bad faith constitutes cause under section 349(a) and barring re-filing for 360 days based on "[d]ebtor's single-minded intent to avoid

---

historically is just 3.5–5.0%. (*See* Appraisal at B-24.) Accordingly, actions must be brought to cause Debtor to reject the PPA and any existing territory agreement for the provision of power at the hotel. An audit of estate claims and causes of action against SBC and SAII is needed, as are investigations into other matters, including a newly discovered $320,000 per year being paid to SBC for water use that is not being used for SBC operations, the hotel supplying power to a neighboring building, and meddling with tenants in the commercial office space at the hotel. (Deines Decl. ¶ 23.)

payment to [its] [c]reditor"); *In re Spear*, 203 B.R. 349, 354 (Bankr. D. Mass. 1996) (barring re-filing to prevent the debtor from using bankruptcy as a "tactic to harass and frustrate her creditors").

## CONCLUSION

78. WHEREFORE, X-Caliber respectfully requests that this Court (1) grant X-Caliber relief from the automatic stay to exercise its rights and remedies against its collateral, including, without limitation, to continue its prepetition foreclosure and sale proceedings, or (2) in the alternative, dismiss Debtor's chapter 11 case for cause and bar Debtor from re-filing for a period of 180 days, and (3) grant X-Caliber such other and further relief as is equitable and appropriate under the circumstances.

*[Remainder of page intentionally left blank.]*

Dated: October 19, 2026

Respectfully submitted,

**RUBIN AND RUDMAN LLP**

*/s/ Rion M. Vaughan*
Rion M. Vaughan (BBO #689153)
53 State Street, 15th Floor
Boston, MA 02109
(617) 330-7143
RVaughan@rubinrudman.com

**BLANK ROME LLP**
Paige B. Tinkham (admitted *pro hac vice*)
444 West Lake Street
Suite 1650
Chicago, IL 60606
(312) 776-2600
Paige.Tinkham@blankrome.com

Matthew E. Kaslow (*pro hac vice* forthcoming)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5500
Matt.Kaslow@blankrome.com

*Attorneys for X-Caliber Rural Capital, LLC*