UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re<br><br>SOUTHBRIDGE ASSOCIATES, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 26-41208-EDK |

**NOTICE OF COMPETING BID OF CHRISTOPHER ROBERT OR HIS NOMINEE WEBSTER VENTURES, LLC FOR THE PURCHASE OF THE PROPERTY AT 14 MECHANIC STREET, SOUTHBRIDGE, MASSACHUSETTS**

Christopher Robert or his nominee, Webster Ventures, LLC, a Massachusetts limited liability company with an address at 14 Henry Road, Webster, Massachusetts 01570 (“Webster Ventures” or the “Bidder”), files this Competing Bid under the Notice of Bidding Procedures for Sale of Assets (the “Bid Procedures”) [Doc. 83-2], which accompanies the Debtor’s Motion for Authority to Sell Property of the Estate Free and Clear by Private Sale and Bidding Procedures [Doc. 83] (the “Sale Motion”). Webster Ventures states as follows:

1. **Property.** The Bidder offers to purchase all of the Debtor’s right, title, and interest in the Property, as defined in the Bid Procedures and the Asset Purchase Agreement dated November 2, 2026 between the Debtor and Lundgren Equity Partners LLC (the “Stalking Horse APA”). The Property consists of the land and improvements at 14 Mechanic Street, Southbridge, Massachusetts, including the Wellsworth Hotel and office building, and the related Appurtenances.

2. **Purchase Price.** The Bidder offers a cash purchase price of **Five Million Two Hundred Fifty Thousand and 00/100 Dollars ($5,250,000.00)**. This amount equals the $5,000,000.00 Purchase Price plus the required 5% minimum overbid of $250,000.00, as set forth in paragraph 2(a) of the Bid Procedures.

3. **Good Faith Deposit.** The Bidder has delivered, or will deliver before the Bid Deadline, a Good Faith Deposit of $100,000.00 by certified check to Madoff & Khoury LLP, as Escrow Agent. A copy of the certified check is attached as **Exhibit 4**. The deposit will be applied against the purchase price at closing.

4. **Marked and Clean Purchase Agreements.** Attached as **Exhibit 1** is a black-lined copy of the Stalking Horse APA showing the Bidder's changes. Attached as **Exhibit 2** is an executed clean copy of that agreement. The Bidder's changes are limited to (a) substituting Webster Ventures, LLC as Buyer, (b) increasing the Purchase Price to $5,250,000.00, (c) deleting the Buyer's Due Diligence Period termination right and the Break-Up Fee and Expense Reimbursement provisions, which apply only to the Stalking Horse Purchaser, and (d) updating the Buyer notice information to Webster Ventures, LLC, 14 Henry Road, Webster, Massachusetts 01570, Attn: Christopher Robert, Manager.

5. **No Material Contingencies.** This bid is not subject to financing, internal approvals, further due diligence, or any other material condition to closing, except the closing conditions in the Stalking Horse APA.

6. **Proof of Funds.** Attached as **Exhibit 3** is written proof of funds sufficient to pay the full purchase price and any cure costs for contracts the Bidder elects to assume. The Bidder is serving that proof of funds by e-mail on counsel to the Debtor, counsel to X-Caliber Rural Capital, LLC, counsel to the Proposed Buyer, and the United States Trustee.

7. **Executory Contracts.** The Bidder reserves its election as to which of the executory contracts and unexpired leases listed on Exhibit C to the Sale Motion it

will take by assumption and assignment. The Bidder will pay any cure costs for each contract it assumes.

8. **Ability to Close.** The Bidder is able and ready to close on November 20, 2026, or on another date agreed by the Debtor and X-Caliber Rural Capital, LLC.

9. **Auction and Back-Up Bid.** A representative of the Bidder will appear in person at the sale hearing on November 19, 2026 at 10:00 a.m., Courtroom 3, Harold D. Donohue Federal Building, 595 Main Street, Worcester, Massachusetts. The Bidder acknowledges that later bids must be at least $50,000 above the most recent bid. If the Bidder is not the Successful Bidder, it agrees to serve as back-up bidder at its last bid made at the auction, provided that its back-up commitment and Good Faith Deposit will be released, and the deposit returned, if the Debtor has not called on the Bidder to close within fourteen (14) days after entry of the sale order.

10. **Bidder Contact and Authority.** Webster Ventures, LLC, 14 Henry Road, Webster, Massachusetts 01570; Attn: Christopher Robert, Manager, chrisrobert1@icloud.com. Christopher Robert, as Manager, is authorized to sign this bid and the purchase agreement for the Bidder. Counsel: Douglas Radigan, Prince Lobel Tye LLP, 1 Mercantile Street, Suite 220, Worcester, Massachusetts 01608; (508) 318-1728.

WHEREFORE, Webster Ventures, LLC asks the Court and the Debtor to treat this bid as a Qualified Bid and Competing Bid, and to allow the Bidder to take part in the auction at the sale hearing.

Respectfully submitted,

CHRISTOPHER ROBERT OR HIS NOMINEE,
WEBSTER VENTURES, LLC,

By Its Attorneys,

*/s/ Douglas T. Radigan*

Douglas T. Radigan (BBO #657938)
Mark W .Powers (BBO #555337)
PRINCE LOBEL TYE LLP
One Mercantile Street, Suite 220
Worcester, MA 01608
Telephone: 508-318-1728
Email: dradigan@princelobel.com
mpowers@princelobel.com

Dated: November 18, 2026

**CERTIFICATE OF SERVICE**

I certify that on November 18, 2026, before 12:00 p.m., I filed this Notice of Competing Bid and its exhibits through the Court's CM/ECF system. On the same date, I served it, with the proof of funds, by e-mail on: Madoff & Khoury LLP (David B. Madoff, madoff@mandkllp.com; Nina M. Parker, parker@mandkllp.com), counsel to the Debtor; counsel to X-Caliber Rural Capital, LLC; Riemer & Braunstein LLP (Alan L. Braunstein, abraunstein@riemerlaw.com); counsel to Lundgren Equity Partners LLC; and the Office of the United States Trustee.

*<u>/s/ Douglas T. Radigan</u>*
Douglas T. Radigan



#6553754v1

# **EXHIBIT 1**

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made this ~~2nd~~18th day of November, 2026 (the "Effective Date"), by and between SOUTHBRIDGE ASSOCIATES LLC, a Delaware limited liability company (hereinafter referred to as "Seller") and Debtor-in-Possession, and ~~LUNDGREN EQUITY PARTNERS~~WEBSTER VENTURES, LLC, a Massachusetts limited liability company with a usual place of business at ~~163 Washington Street, Auburn~~14 Henry Road, Webster, Massachusetts ~~01501~~01570, (including its permitted designee or assignee, hereinafter referred to as "Buyer"). Seller and Buyer are each referred to as a "Party" and collectively as the "Parties."

WITNESSETH:

WHEREAS, Seller owns the tracts of land known as 14 Mechanic Street, Southbridge, Massachusetts, together with all buildings, structures and improvements located thereon; and

WHEREAS, Seller desires to sell the Property (as hereinafter defined), and Buyer desires to buy said Property upon the terms and conditions set forth in this Agreement; and

WHEREAS, (i) on October 6, 2026, Seller commenced case number 26-41208-EDK (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), and (ii) the purchase of the Property by Buyer will occur in the Bankruptcy Case pursuant to section 363 of the Bankruptcy Code. Buyer further understands the Bankruptcy Court established the bid procedures at a hearing conducted on October 29, 2026 (the "Bid Procedures "), The bidding and auction procedures to sell the Property to Buyer (or other successful bidder) are binding, subject to the further provisions herein.

NOW THEREFORE, IN CONSIDERATION of the respective agreements and mutual promises hereinafter set forth, Seller and Buyer hereby agree as follows:

**1. Property Included in Sale.**

Seller hereby agrees to sell, assign and convey to Buyer, and Buyer hereby agrees to purchase from Seller, the following:

(a) The real property located and commonly known as 14 Mechanic Street, Southbridge, Southbridge, Massachusetts, and more particularly described on Exhibit A attached hereto (the "Land"), including, without limitation, all buildings, including the hotel (being the "Wellsworth Hotel") and office building, improvements, personal property of every sort, contractual rights (concerning which the Buyer may compel the Seller to reject or to assume and then to assign to the Buyer), and permanent fixtures situated on and under the Land, if any, and any and all property in which XC (defined below) holds a security interest (collectively, the "Improvements"); and

(b) All of the interest of Seller, if any, in any rights, profits, privileges and easements appurtenant to the Land and/or the Improvements, including, without limitation, all development rights, parking rights, rights of way, air rights, water, water rights, and water stock, trademarks, service marks, trade names and other intellectual property, and any easements, rights of way or other appurtenances used in connection with the beneficial use and enjoyment of the Land (collectively, the "Appurtenances").

All of the items referred to in this Section I are hereinafter collectively referred to as the "Property."

**2. Deposit.**

(a) Not later than ~~5:00 pm EDT~~12:00 p.m. EST on November ~~4~~18, 2026, Buyer shall pay a deposit in the amount of One Hundred Thousand and 00/100 ($100,000.00) Dollars (the "Deposit"), in to escrow with Madoff and Khoury LLP (the "Escrow Agent"), who shall hold such amount in an noninterest bearing or client trust IOLTA account to secure Buyer's performance hereunder and who shall hold the Deposit pursuant to and in accordance with Exhibit C of this Agreement and any supplemental terms pursuant to agreement by the Parties. Buyer's failure to timely pay the Deposit in full to the Escrow Agent (time being of the essence) shall permit Seller to terminate this Agreement.

(b) No interest on the Deposit shall be paid over to Seller at Closing (as defined in Section 6 hereof) or to Buyer if the Deposit is returned to Buyer pursuant to the terms of this Agreement.

**3. Purchase Price.**

(a) The Purchase Price of the Property is Five Million Two Hundred Fifty Thousand and 00/100 ($5,~~000~~250,000.00) Dollars (the "Purchase Price") which Buyer hereby agrees to pay at Closing (as hereinafter defined), provided that X Caliber Rural LLC - the secured lender holding senior mortgage(s) and security interest(s) on such assets (collectively, "XC") caps its credit bid rights under section 363(k) of the Code at an amount no greater than Seven Million and 00/100 Dollars ($7,000,000.00) in the aggregate for such secured interests.

(b) The Purchase Price shall be paid as follows:

(1) The Deposit shall be applied against the Purchase Price at Closing; and

**4. Title to the Property.**

(a) At Closing, Seller shall convey to Buyer the Land, Improvements and Appurtenances by delivery of a Quitclaim Deed, substantially in the form of Exhibit B hereto (the "Deed"), duly executed, acknowledged and recorded through Title Insurance Company (the "Title Company"). Such fee simple title shall be good and insurable subject to the following: (i) easements, conditions and restrictions of record which have been approved by Buyer during the Due Diligence Period which do not prohibit use of the Property for commercial

purposes in accordance with applicable laws; (ii) real estate taxes and betterment assessments assessed upon the Property by the Town of Southbridge which are not yet due and payable; (iii) water and sewer rates, charges and assessments which are not yet due and payable; (iv) the ALTA standard printed exclusions-from coverage contained in the ALTA form of owner's title policy currently in use in Massachusetts, with the standard Massachusetts endorsement(s); (v) zoning ordinances and restrictions and amendments thereto now or hereafter in force or effect applicable to the ownership, use or development of, or the right to maintain or operate, the Property; (vi) all public utility company rights, if any, easements and franchises to lay, install, maintain and operate lines, poles, wires, cables, pipes, distribution boxes and other fixtures and facilities in, over, under and upon the Property which were disclosed in title commitment delivered to Buyer by the Title Company prior to the expiration of the Due Diligence Period, and (vii) such matters as the Title Company shall be willing, without special premium to Buyer, with respect to the title policy issued by the Title Company to Buyer at Closing, to omit as exceptions to coverage.

(b) Anything to the contrary in this Agreement notwithstanding, during the Due Diligence Period, Buyer and its authorized agents shall have the opportunity to satisfy themselves as to the status of title matters. Buyer shall notify Seller in writing (the "Title Notice") prior to the expiration of the Due Diligence Period which exceptions to title, if any, will not be accepted by Buyer. If Buyer fails to notify Seller in writing of any exceptions to title by the expiration of the Due Diligence Period, then Buyer shall be deemed to have approved the condition of title. If Buyer notifies Seller in writing that Buyer objects to any exceptions to title, then Seller shall have five (5) days after receipt of the Title Notice to notify Buyer in writing (i) that Seller will endeavor to remove such objectionable exceptions from title on or before the Closing; or (ii) that Seller elects not to cause such exceptions to be removed. If Seller fails to notify Buyer in writing of its election within said five (5) day period, then the Seller shall be deemed to have elected not to cause such exceptions to be removed. If Seller gives Buyer notice under clause (ii) above, then Buyer shall have five (5) days within which to notify Seller in writing that Buyer will nevertheless proceed with the purchase and take title to the Property subject to such exceptions; otherwise, this Agreement shall automatically terminate upon the expiration of such 5-day period. If this Agreement shall not be terminated, and if at any time between the end of the Due Diligence Period and the Closing Buyer shall discover one or more newly recorded title exceptions to which it wishes to object, then Buyer shall send to Seller Buyer's further notice of objection ("Additional Title Notice") promptly upon discovery of said new objectionable matters. Seller shall have five (5) days after receipt of the Additional Title Notice to notify Buyer in writing (i) that Seller will endeavor to remove such newly objectionable exceptions from title on or before the Closing; or (ii) that Seller elects not to cause such exceptions to be removed. Seller's failure to give its notice shall be deemed its election not to remedy such objections. If Seller gives Buyer notice under clause (ii) above, then Buyer shall have five (5) days within which to notify Seller in writing that Buyer will nevertheless proceed with the purchase and take title to the Property subject to such exceptions; otherwise, this Agreement shall automatically terminate upon the expiration of such 5-day period. If this Agreement is terminated pursuant to the foregoing provisions of this paragraph, then neither party shall

have any further rights or obligations hereunder, the Deposit and all interest thereon shall be returned to Buyer. ~~In the event of termination under the forgoing provisions neither the Break-Up Fee nor the Expense Reimbursement (as such terms are hereinafter defined) shall be due Buyer.~~

**5. Buyer's Inspection Rights.**

(a) The Buyer will have until 12:00 pm EDT, November 16, 2026 (being the fourteenth day following the Parties' execution of, and pursuant to that offer to purchase dated November 2, 2026, hereinafter, the "Offer") to conduct diligence (the "Due Diligence Period") with respect to the Property. Within the Due Diligence Period Seller and/or XC has provided or will provide the Buyer with all due diligence information reasonably requested by the Buyer regarding the Property to the extent in Seller's actual possession and/or control, including without limitation, all documents, materials and due diligence information relating to the Property, including any environmental site assessments, historical invoices for utilities, insurance information, title reports and maintenance contracts. Seller shall also provide the Buyer with any information and materials it provides to any other potential bidder. Seller shall allow the Buyer and its consultants, professionals, investors, contractors and representatives (collectively, "Representatives") access to the Property on reasonable advance notice to Seller consistent with the terms of clause (b) below, from the date hereof through the earlier of (i) termination of this Agreement, as the case may be, or (ii) the closing of the Sale (as hereinafter defined). Seller and/or XC shall provide to Buyer a copy of an existing Phase I environmental site assessment. Seller further acknowledges that it has no actual knowledge of the existence of any existing environmental condition at the Property that would require further investigation. ~~If~~ Buyer ~~in its sole discretion is dissatisfied with~~<ins>shall have no right to terminate this Agreement based on</ins> the results of its due diligence ~~investigations of Seller and/or the Property, then Buyer may elect to terminate this Agreement by written notice given to Seller not later than the date which is one (1) Business Day before the expiration of the Due Diligence Period, time being of the essence hereof, whereupon this Agreement shall be deemed terminated~~<ins>,</ins> and the ~~Deposit shall be refunded to Buyer and neither Party shall have any further rights or obligations under this Agreement except as otherwise expressly provided herein. If Buyer does not elect to terminate this Agreement (or fails to deliver its notice of termination in a timely manner), then the~~ Parties, subject to the other conditions of Closing and other terms as set forth in this Agreement, shall proceed to Closing (as hereinafter defined)~~, and the termination right set forth in this Section 5(a) shall be of no further effect. In the event Buyer elects to so terminate this Agreement (or this Agreement is otherwise deemed to be terminated), the Deposit thereon shall be refunded to Buyer, Buyer shall return the diligence materials to Seller, and neither of the Parties shall have any further rights or obligations under this Agreement except as otherwise expressly provided herein~~.

(b) From and after the date of the execution hereof by both Buyer and Seller and notwithstanding any term or provision herein contained to the contrary, Seller shall afford Representatives of Buyer reasonable access to the Property for the purposes of satisfying

Buyer with respect to its due diligence and title. Such access shall be at the sole risk of Buyer, Buyer agreeing to repair any damage caused by its negligence and to indemnify and hold harmless Seller for any liability resulting therefrom. Buyer shall advise Seller of the names and business affiliations of all such authorized representatives at least twenty-four (24) hours before their arrival at the Property.

**6. The Closing.**

(a) Without limiting the foregoing, Seller shall file a sale motion for approval and conduct of the auction and sale of the Property to Buyer (or other successful bidder), subject to counterbids, at a hearing on November 19, 2026 (the "Sale Approval Hearing"). The sale motion shall also state that the net sale proceeds (subject to a holdback for the amounts identified in Section 6[h] below) are paid directly to XC less other usual and necessary expenses incurred as part of the sale, including allocable fees payable to the US Trustee on a quarterly basis, and recording costs/excise or transfer taxes, and that overbids must be five percent (5%) pursuant to the local rules of the Bankruptcy Court.

(b) The Sale Approval Hearing shall be scheduled for November 19, 2026 (or such other date as may be continued solely by the Bankruptcy Court). Any order approving the Sale to Buyer (the "Sale Order") shall be in form and substance reasonably acceptable to Buyer and Seller, and include the following: (i) findings and conclusions pursuant to Bankruptcy Code sections 105(a) and 363(b), (f) and (m), that (A) the terms and conditions of this Agreement are approved by the Bankruptcy Court, and B) the Seller is authorized and empowered to close on the sale of the Property pursuant to this Agreement and to sell to Buyer (or such other successful bidder) the Property, free and clear of any and all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code ("Interests"), with all such Interests to attach to the net proceeds of the sale of the Property in the order of their priority and having the same validity, force and effect (if any) which they now have against the Property (the "Sale"), (ii) findings and conclusions that (A) due and proper notice has been afforded in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the local rules of the Bankruptcy Court and the orders of the Bankruptcy Court and all aspects of the transactions contemplated by this Agreement have been adequately disclosed; (B) the Purchase Price under this Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code for the Property; (C) Buyer is a good faith purchaser as that term is used in Section 363(m) of the Bankruptcy Code; (D) the Sale has not been entered into fraudulently and Buyer has not engaged in collusive bidding or otherwise violated the provisions of Section 363(n) of the Bankruptcy Code; (E) title to the Property shall vest in Buyer free and clear of all Interests, and Buyer shall not be liable for, any and all liabilities related to Seller's pre-closing operations of any type or nature whatsoever; (F) Buyer shall not be liable for any claims or debts of Seller, except those assumed by Buyer; (G) the Bankruptcy Court will retain jurisdiction over enforcement of the Sale Order and to determine any disputes arising out of the Sale Order; and (H) Buyer is not intended to be and shall not be deemed to be a successor to Seller; and (iii) a waiver of the stay imposed by

Bankruptcy Rule 6004(h). Furthermore, the Parties agree that the Sale Hearing may be adjourned solely upon consent of the Buyer. Seller, and Lender.

(c) Absent termination of this Agreement or entry of a Sale Order authorizing the sale of the Property to another entity, the Parties shall be obligated to close on the Sale (the "Closing") on November 20, 2026; provided, however, that Buyer has requested, and the Closing shall occur on such later date as Seller and XC may agree in writing, but in no event later than [December 4, 2026]. If Seller and XC do not so agree, Buyer shall close on November 20, 2026 as provided above.

(d) At Closing, Seller shall deliver the following to the Buyer, each of which shall be a condition to Buyer's obligation to purchase the Property on the Closing Date:

(1) The Deed as required by Section 4(a) above;

(2) A duly executed counterpart of a Closing Statement in form and content reasonably satisfactory to Buyer and Seller;

(3) The information necessary to complete Internal Revenue Service Form 1099S, including a §6045 designation of the Escrow Agent as the reporting party;

(4) The full amount of all customer deposits paid to the hotel;

(5) Assignment of all leases and occupancy agreements, and letters to all tenants and occupants announcing the change in ownership; and

(6) Such additional documents, instruments, agreements, certificates, resolutions, and waivers as Buyer or its title insurer may reasonably request to transfer title to the Property to Buyer in accordance with this Agreement and to issue a title policy without standard exceptions, including a non-foreign ("FIRPTA") affidavit and a customary title affidavit.

Buyer may waive compliance on Seller's part under any of the foregoing items by an instrument in writing.

(e) At Closing, Buyer shall deliver to Seller the following each of which shall be a condition to Seller's obligation to sell the Property on the Closing Date:

(1) The Purchase Price;

(2) A duly executed counterpart of the Closing Statement; and

(3) Such additional documents, instruments, agreements, certificates and waivers as Buyer's title insurer may reasonably request to transfer title to the Property to Buyer.

Seller may waive compliance on Buyer's part under any of the foregoing items by an instrument in writing, unless such instrument requires approval of the Court.

(f) In addition to the closing conditions referred to above, closing of the Sale shall be contingent upon the following (without which, absent waiver by Buyer, shall result in Buyer's right to terminate this Agreement and receive a refund of the Deposit):

(1) Entry of the Sale Order providing for the sale of the Property to Buyer in the manner provided for in this Agreement including, without limitation, Section 6;

(2) The issuance of a title policy by the Title Company to Buyer insuring Buyer's fee ownership of the Property free and clear of all Interests, including all monetary liens voluntarily granted by Seller (including the liens of Lender, and also including, without limitation, tax liens and other unpaid taxes) and all matters relating to the Bankruptcy Case; and

(3) No injunction, stay, or similar Order issued by any Governmental Authority' shall be in effect that restrains, enjoins, stays, or prohibits he consummation of the transactions set forth in this Agreement and there must not be in effect any Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(g) Seller represents and warrants to Buyer that Seller holds fee simple title and interest in and to the Land, Improvements, and Appurtenances comprising the Property in its entirety, and has full right and authority, without the prior consent of any third party or governmental entity or administrative or juridical authority other than the Bankruptcy Court to enter into and consummate this transaction. Except as expressly stated in this Agreement concerning any contracts or other obligations that Buyer may elect to assume, Buyer is not assuming any obligations or liabilities of Seller or otherwise relating to the Property with respect to acts and omissions prior to the Closing (all of which shall remain with Seller from and after the Closing).

~~The~~Buyer acknowledges that the Bid Procedures ~~shall be in form and substance reasonably acceptable to Buyer and Seller, shall grant Buyer certain "stalking horse" protections, including a break-up fee in an amount equal to (1) amounts disbursed by the Buyer to pay the payroll of Roger Sinni Jonathan Jones and Richard Lord, and any other permitted expense~~were approved ~~by XC, in writing, to maintain/sustain the operation of SBC Energy LLC ("SBC") until the earlier of (a) consummation of the section 363 sale of the purchased assets or (b) November 17, 2026; and (2) reasonable and necessary legal fees and due diligence expenses of the Buyer related to due diligence activities and related to the negotiation of this Agreement and the Offer and in furtherance thereof, which amounts under this clause (2) shall be subject to approval~~ by the Bankruptcy Court ~~for such services~~, and ~~expenses related to the 363 offer and sale process and which such due diligence and legal fees and expenses~~Buyer shall not ~~exceed $50,000, which amounts shall~~ be ~~paid from the proceeds of the sale transaction in the event Buyer is not the successful bidder (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"). If the Buyer is not the successful bidder, the Buyer shall also receive reimbursement of all amounts it shall have advanced~~entitled to ~~SBC and held in an account at Webster Five Bank, which reimbursement shall be deemed to be a part of the Expense Reimbursement due and~~

~~owing to the Buyer. Except as provided below, if the Bankruptcy Court approves a sale of the Property to~~ any ~~party~~break-up fee, expense reimbursement, or other ~~than Buyer, Buyer shall be entitled to be paid the Break-Up Fee and the Expense Reimbursement (and the refund of the Deposit). For avoidance of doubt, Buyer shall not be entitled for a breakup fee equal to amounts paid by SBC from its cash~~bid protection. Non- insider unsecured creditors, excluding any creditor receiving proceeds of the sale, shall be provided a $50,000 carveout in addition to the Chapter 11 administrative expenses carveout from XC's cash collateral being held by Debtor for pro rata distribution. If Buyer fails to close due to a material breach by Buyer of any specified material obligation(s) under this Agreement, Buyer shall forfeit the ~~Break-Up Fee, the Expense Reimbursement, and the~~ Deposit, ~~the last of~~ which shall be retained by Seller as liquidated damages as its exclusive remedy in respect thereof. Damages being difficult to ascertain as the result of a material breach by Buyer, the Parties agree that the amount of the Deposit shall be deemed adequate compensation to Seller. ~~If Buyer elects to terminate this Agreement as a result of its due diligence investigations prior to the expiration of the Due Diligence Period, as provided herein, it shall not be entitled to either the Break-Up Fee or the Expense Reimbursement. The Bid Procedures shall provide that the Break-Up Fee and the Expense Reimbursement, to the extent payable to Buyer, constitute an allowed super-priority administrative expense claim against Seller's bankruptcy estate. The Bid Procedures shall provide, among other things, that the potential cost to Seller's bankruptcy estate of the Break-Up Fee and Expense Reimbursement shall be used by Seller in determining the "highest or otherwise best" bid during each round of any auction held in accordance with the Bid Procedures; provided, however, that Buyer at any auction held in respect to the sale of the Property shall announce at such auction, in good faith, its best estimate of the amount of the Expense Reimbursement. In addition, the Bid Procedures shall set forth bid protections that, among other things, (i) conclusively deem the Agreement a "qualified bid" and the Buyer a "qualified bidder" entitled to participate at any auction, and (ii) provide a minimum initial overbid requirement for any auction of Two Hundred Fifty Thousand 00/100 ($250,000.00) Dollars. Buyer shall be entitled to credit bid the Break-Up Fee and Expense Reimbursement.~~

For purposes of this Agreement, the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non- governmental regulatory authority or quasi-governmental authority, or any arbitrator, court or tribunal of competent jurisdiction.

**7. Apportionments.**

The following are to be apportioned as of 12:01 A.M., on the date of Closing on the basis of a 365-day year:

(a) Real and Personal Property Taxes. Real Property taxes for the Property for the current year and assessments, if any, shall be apportioned between the Parties hereto as of 12:01 A.M. on the date of Closing for the period of time to which the then outstanding and unpaid tax bills apply. If the amount of said taxes or assessments is not known at such time, they

shall be apportioned on the basis of the immediately preceding period for which the taxes have been paid or which were due. Such taxes and/or assessments shall be reapportioned as soon as the new rate or valuation can be ascertained. Within ten (10) days after such reapportionment, if any, Seller shall notify Buyer of such reapportionment in writing, and Seller or Buyer, as the case may be, shall, within ten (10) days of the date of such notice, remit to the other the amount owed as a result of such reapportionment. The Buyer shall assume and retain all rights to any abatements as the successful bidder.

(b) Water. Sewer and Utility Charges. All water, sewer and utility charges shall be apportioned as of 12:01 A.M. on the date of Closing. If such apportionment cannot be calculated accurately at that time, the same shall be calculated within thirty (30) days after Closing and either Party owing the other Party a sum of money based on such subsequent apportionment shall promptly pay said sum to the other Party.

(c) Operating Expenses. All expenses normal to the operation and maintenance of the Property not otherwise addressed herein, as to the hotel and including, without limitation, fuel in any tank, annual permit or inspection fees, insurance premiums (as to those policies which Buyer determines will be continued after Closing), hotel deposits of customers of the hotel and service contracts which Buyer may elect to assume or compel Seller to assume on Buyer's behalf (which contracts Buyer may compel Seller to reject), shall be apportioned as of 12:01 A.M. on the date of Closing. If such apportionment cannot be calculated accurately at that time, the same shall be calculated within thirty (30) days after Closing and either Party owing the other Party a sum of money based on such subsequent appointment shall promptly pay such sum to the other Party.

(d) Rents. All rental amounts paid by tenants and other occupants of the office portion of the building(s) on account of the rental period in which the date of Closing shall occur.

**8. Payment of Costs.**

(a) All transfer taxes and deed stamp excise tax payable upon execution and recording of the Deed (to the extent due and owing, the "Transfer Taxes") shall be paid by Seller.

(b) Buyer shall pay all title abstracting costs, costs incurred in connection with the preparation of a preliminary title insurance binder and with the title insurance policy and survey, title insurance premium, fees for recording of the Deed conveying title to Buyer. The costs referred to in the foregoing section (b) are the "Closing Costs."

(c) Seller shall pay Seller's attorneys' fees incurred in connection with this transaction and other closing costs otherwise customarily paid by sellers in Massachusetts real estate purchases/sales and the US Trustee quarterly fees allocated to the sale price of the Property. Buyer shall pay Buyer's attorneys' fees incurred in connection with this transaction.

**9. Termination of Agreement.**

This Agreement may be terminated (i) by mutual consent of Seller and Buyer; (ii) by Buyer (a) in the event of a material breach by Seller of this Agreement, subject to Buyer's remedies in respect thereof pursuant to this Agreement, (b) if Buyer is not satisfied with the results of its due diligence investigation as set forth above prior to expiration of the Due Diligence Period and provides the requisite timely notice, or (c) if the Bankruptcy Court does not approve the Bid Protections in favor of Buyer; (iii) by Seller in the event of a material breach by the Buyer of its Agreement subject to the terms hereof; or (iv) by Seller or Buyer if either (a) the Agreement is not fully executed and delivered by November _, 2026 and the Deposit not timely paid or (b) ifby the Bid Procedures are not agreeable to BuyerDeadline established under the Bid Procedures.

**10. Loss by Fire or other Casualty; Condemnation.**

In the event that, prior to Closing, the Property, or any part thereof, is destroyed or damaged or if condemnation proceedings are commenced against any portion of the Property, Buyer shall have the right, exercisable by giving notice of such decision to Seller within fifteen (15) days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, in which case the Deposit and any interest accrued thereon shall be returned to Buyer and neither Party shall have any further rights or obligations hereunder except as otherwise expressly provided herein, including the Buyer's allowance of its Expense Reimbursement and Break-Up Fee being allowed as an administrative expense claim payable from the Debtor's accounts. If Buyer elects to accept the Property in its then condition, all proceeds of insurance or condemnation awards payable to Seller by reason of such damage, destruction, or condemnation shall be paid or assigned to Buyer irrespective of any applicable deductible (which deductible, if any, shall be paid by Seller) or condemnation awards paid to Buyer by Seller. In the event of any cost to repair the destruction or damage to the Property, Buyer shall accept the Property in its then condition and proceed with the purchase as herein provided without reduction of the Purchase Price to the extent of the cost of repairing such damage or replacing the damaged property exceeds the amount of any insurance proceeds.

**11. Possession.**

Full possession of the Property, with all tenants, leases, licenses, occupancy agreements, including any hotel management agreement assigned to Buyer (collectively, "Leases") and occupants (and free of all rights of first offer or other purchase rights) is to be delivered at the Closing, the Property to be then (a) in the same condition as now, subject to the terms of Section 12 hereof, except that Seller shall remove from the Property prior to the closing all personal property and equipment (which is not permanently affixed or used in the operation of the hotel or office building or elsewhere on or about the Property) including, without limitation, the inventory and equipment necessary for operation of the Property and Improvements, and (b) in compliance with any applicable easement, covenant or restriction of record and all applicable law.

**12. Maintenance of and Insurance upon the Property.**

Between the time of Seller's execution of this Agreement and Closing, Seller shall; (i) maintain the Property in the same order, condition, and repair as is consistent with its past practices, reasonable wear and tear and damage by casualty excepted; (ii) operate the Property in the same manner as before the making of this Agreement, the same as though Seller were retaining the Property; and (iii) keep the Property insured, at its expense, against fire and other extended coverage perils in an amount not less than one hundred percent (100%) of its replacement cost (without any co-insurance liability).

**13. No Leases.**

From and after the Effective Date, Seller shall not enter into any Leases or encumbrances upon the Property or enter into any binding or non-binding letters of intent with prospective tenants or other potential parties to Leases without obtaining Buyer's prior written approval in each case.

**14. Miscellaneous.**

(a) Notices. Unless otherwise specifically set forth herein, any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given when (I) delivered personally, (2) five (5) Business Days after being deposited in a United States Post Office, registered or certified mail, postage prepaid, return receipt required, or upon delivery or rejected delivery by a reputable overnight courier service providing proof of delivery, (3) upon delivery by electronic mail (provided a copy is sent by overnight courier with one Business Day of delivery of the notice by electronic mail) and addressed as follows:

If to Seller:

Southbridge Associates LLC 36 Washington Street, Suite 390 Wellesley, MA 02481 Attn: Barry R. Lundgren E-mail:

With a copy to:

Madoff & Khoury, LLP 124 Washington Street, Suite 202 Foxboro, MA 02035 Attn: David Madoff, Esq. madoff@mandkllp.com Attn: Nina M. Parker, Esq. parker@mandkllp.com

Ns Riemer & Braunstein LLP 100 Cambridge Street, 22nd floor Boston, MA 02114 Attn: Alan L. Braunstein, Esq. E-mail: abraunstein@riemerlaw.com

If to Buyer:

~~Barry R. Lundgren Lundgren Equity Partners~~Webster Ventures, LLC ~~163 Washington Street Auburn~~14 Henry Road Webster, MA ~~01501~~01570 Attn: Christopher Robert, Manager E-mail: chrisrobert1@icloud.com

With a copy to:

~~Riemer & Braunstein~~Prince Lobel Tye LLP ~~100 Cambridge~~1 Mercantile Street, ~~22nd floor Boston~~Suite 220 Worcester, MA ~~02114~~01608 Attn: ~~Alan L. Braunstein~~Douglas Radigan, Esq.
~~E-mail: abraunstein@riemerlaw.com~~

or such other address as either Party may from time to time specify in writing to the other.

(b) Brokers and Finders. Seller has not had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker, auctioneer, or other person who can claim a right to a commission or finders' fee as a procuring cause of the sale contemplated herein, and in any case there has been no pre-bankruptcy approval sought or obtained by the Seller regarding any such professional in relation to this transaction.

(c) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, heirs, administrators, and assigns. Without being relieved of any liability under this Agreement, Buyer reserves the right to take title to the Property in a name other than that of Buyer or to assign its rights under this Agreement.

(d) Amendments and Termination. This Agreement may be amended or modified or terminated only by a written instrument executed by Seller and/or Buyer as applicable, and if required, further approval by the Court, except where unilateral termination by a Party is expressly permitted pursuant to this Agreement.

(e) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and applicable provisions of the federal Bankruptcy Code and rules of the Bankruptcy Court.

(f) Merger of Prior Agreements. This Agreement supersedes all prior agreements and understandings between the Parties hereto relating to the subject matter hereof (including, without limitation, the Offer) and constitutes the entire agreement between the Parties hereto with respect to the transactions contemplated herein.

(g) Enforcement. In the event either of the Parties fails to perform any of its obligations under this Agreement or in the event a dispute arises concerning the meaning or interpretation of any provision of this Agreement then such dispute shall be decided by the Bankruptcy Court which the Parties agree have exclusive jurisdiction over the agreement and the Parties by law and the Agreement.

(h) Remedies. If Seller shall tender the Deed and all other closing documents required by this Agreement and shall otherwise be in compliance with its obligations hereunder and all conditions precedent to Buyer's obligations have been satisfied, performed or waived by Buyer (and other closing requirements satisfied) and if Buyer shall fail or refuse to close title as required by the terms of this Agreement or if Buyer is otherwise in default hereunder so that Seller has the right to refuse to close this transaction, Seller shall have the

right to retain the Deposit, which shall be Seller's sole and exclusive remedy at law or in equity as more particularly set forth elsewhere in this Agreement.

In the event that Seller shall fail to tender the Deed and all other Closing documents required by this Agreement and otherwise comply with its material obligations under this Agreement, and all conditions precedent to Seller's obligations have been satisfied, performed or waived by Seller and if Seller shall fail or refuse to close title as required by the terms of this Agreement, said failures being deemed a material breach, Buyer shall have the right to ~~be paid the Break-Up Fee and Expense Reimbursement (and~~ a return of the Deposit~~)~~, which shall be Buyer's sole and exclusive remedy at law and in equity with respect to Seller's breach.

(i) Time of Essence. Time is of the essence in this Agreement. No waiver of any breach or default by any Party hereto shall be considered to be a waiver of any other or subsequent breach or default.

(j) Waiver of Trial by Jury. Buyer and Seller hereby knowingly and voluntarily waive any rights to request or require trial by jury in any proceeding for any legal or equitable remedy, or in any action based, in whole or in part, on failure of performance or other default under this Agreement.

(k) Exhibits and Schedules. All Exhibits referred to in this Agreement shall be deemed to be attached hereto and made a part hereof.

**15. Title to Real Estate.**

To enable Seller to make the conveyance as herein provided, Seller may at the time of Closing use the Purchase Price or any portion thereof to clear the title of the Property of any or all encumbrances or interests, provided that all instruments so procured are recorded prior to or the recording thereof is assured (via affirmation title insurance or otherwise) at the recording of the Deed for the Property.

**16. Business Day.**

In the event that the date for delivery of any notice or the performance by any Party of any obligation of such Party under this Agreement, shall occur on a Saturday, Sunday or other legal holiday recognized in the Commonwealth of Massachusetts or the municipality or county in which the Property is located (a "Non-business Day"), the time for delivery of such notice or performance of such obligation shall be the next day which is not a Non-business Day (a "Business Day").

**17. Confidentiality.**

Up to and ending upon the holding of the Sale Hearing, except for the Offer and this Agreement, Buyer's identity, its financial information, and the identity of any of financing sources, are confidential and are not to be disclosed to anyone, including any other potential bidders, except that Seller and Buyer may disclose such information to (i) its legal and

financial advisors, investors (prospective and current), representatives and other persons involved with the Sale that reasonably need to know such information, (ii) any lender or creditor holding a lien or other encumbrance on the Property, including its legal and financial advisors who need to know such information in connection with its respective evaluations of the transaction contemplated by this Agreement, (iii) the Office of the United States Trustee or (iv) as required by law, court order, SEC requirement, subpoena or otherwise in a litigation, provided that such advisors are informed of the confidential nature of such information and are directed to maintain its confidentiality.

**18. Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Additionally, telecopied signatures or e-mailed signatures may be used in place of original signatures on this Agreement. Seller and Buyer intend to be bound by the signatures on the telecopied or e-mailed document, are aware that the other Party will rely on the telecopied, Docusign, or e-mailed signatures, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF. the Parties hereto have executed this Agreement, as of the date first above written.

SELLER:

SOUTHBRIDGE ASSOCIATES LLC, a Delaware limited liability company

By: Franklin Advisors Southbridge LLC, A Massachusetts limited liability company, its sole member

By: YC Southbridge LLC, manager, a Massachusetts limited liability company

Byf

Date:

11/2/26

BUYER:

~~LUNDGREN EQUITY PARTNERS~~WEBSTER VENTURES, LLC,

By:

Date: ~~11/2/26~~___________

~~Barry R. Lundgren, manager~~Christopher Robert, Manager

[Signature Page to Asset Purchase Agreement]

# EXHIBIT 2

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made this 18th day of November, 2026 (the "Effective Date"), by and between SOUTHBRIDGE ASSOCIATES LLC, a Delaware limited liability company (hereinafter referred to as "Seller") and Debtor-in-Possession, and WEBSTER VENTURES, LLC, a Massachusetts limited liability company with a usual place of business at 14 Henry Road, Webster, Massachusetts 01570, (including its permitted designee or assignee, hereinafter referred to as "Buyer"). Seller and Buyer are each referred to as a "Party" and collectively as the "Parties."

WITNESSETH:

WHEREAS, Seller owns the tracts of land known as 14 Mechanic Street, Southbridge, Massachusetts, together with all buildings, structures and improvements located thereon; and

WHEREAS, Seller desires to sell the Property (as hereinafter defined), and Buyer desires to buy said Property upon the terms and conditions set forth in this Agreement; and

WHEREAS, (i) on October 6, 2026, Seller commenced case number 26-41208-EDK (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), and (ii) the purchase of the Property by Buyer will occur in the Bankruptcy Case pursuant to section 363 of the Bankruptcy Code. Buyer further understands the Bankruptcy Court established the bid procedures at a hearing conducted on October 29, 2026 (the "Bid Procedures "), The bidding and auction procedures to sell the Property to Buyer (or other successful bidder) are binding, subject to the further provisions herein.

NOW THEREFORE, IN CONSIDERATION of the respective agreements and mutual promises hereinafter set forth, Seller and Buyer hereby agree as follows:

**1. Property Included in Sale.**

Seller hereby agrees to sell, assign and convey to Buyer, and Buyer hereby agrees to purchase from Seller, the following:

(a) The real property located and commonly known as 14 Mechanic Street, Southbridge, Southbridge, Massachusetts, and more particularly described on Exhibit A attached hereto (the "Land"), including, without limitation, all buildings, including the hotel (being the "Wellsworth Hotel") and office building, improvements, personal property of every sort, contractual rights (concerning which the Buyer may compel the Seller to reject or to assume and then to assign to the Buyer), and permanent fixtures situated on and under the Land, if any, and any and all property in which XC (defined below) holds a security interest (collectively, the "Improvements"); and

(b) All of the interest of Seller, if any, in any rights, profits, privileges and easements appurtenant to the Land and/or the Improvements, including, without limitation, all

development rights, parking rights, rights of way, air rights, water, water rights, and water stock, trademarks, service marks, trade names and other intellectual property, and any easements, rights of way or other appurtenances used in connection with the beneficial use and enjoyment of the Land (collectively, the "Appurtenances").

All of the items referred to in this Section I are hereinafter collectively referred to as the "Property."

**2. Deposit.**

(a) Not later than 12:00 p.m. EST on November 18, 2026, Buyer shall pay a deposit in the amount of One Hundred Thousand and 00/100 ($100,000.00) Dollars (the "Deposit"), in to escrow with Madoff and Khoury LLP (the "Escrow Agent"), who shall hold such amount in an noninterest bearing or client trust IOLTA account to secure Buyer's performance hereunder and who shall hold the Deposit pursuant to and in accordance with Exhibit C of this Agreement and any supplemental terms pursuant to agreement by the Parties. Buyer's failure to timely pay the Deposit in full to the Escrow Agent (time being of the essence) shall permit Seller to terminate this Agreement.

(b) No interest on the Deposit shall be paid over to Seller at Closing (as defined in Section 6 hereof) or to Buyer if the Deposit is returned to Buyer pursuant to the terms of this Agreement.

**3. Purchase Price.**

(a) The Purchase Price of the Property is Five Million Two Hundred Fifty Thousand and 00/100 ($5,250,000.00) Dollars (the "Purchase Price") which Buyer hereby agrees to pay at Closing (as hereinafter defined), provided that X Caliber Rural LLC - the secured lender holding senior mortgage(s) and security interest(s) on such assets (collectively, "XC") caps its credit bid rights under section 363(k) of the Code at an amount no greater than Seven Million and 00/100 Dollars ($7,000,000.00) in the aggregate for such secured interests.

(b) The Purchase Price shall be paid as follows:

(1) The Deposit shall be applied against the Purchase Price at Closing; and

**4. Title to the Property.**

(a) At Closing, Seller shall convey to Buyer the Land, Improvements and Appurtenances by delivery of a Quitclaim Deed, substantially in the form of Exhibit B hereto (the "Deed"), duly executed, acknowledged and recorded through Title Insurance Company (the "Title Company"). Such fee simple title shall be good and insurable subject to the following: (i) easements, conditions and restrictions of record which have been approved by Buyer during the Due Diligence Period which do not prohibit use of the Property for commercial purposes in accordance with applicable laws; (ii) real estate taxes and betterment assessments assessed upon the Property by the Town of Southbridge which are not yet due and payable; (iii) water and sewer rates, charges and assessments which are not yet due

and payable; (iv) the ALTA standard printed exclusions-from coverage contained in the ALTA form of owner's title policy currently in use in Massachusetts, with the standard Massachusetts endorsement(s); (v) zoning ordinances and restrictions and amendments thereto now or hereafter in force or effect applicable to the ownership, use or development of, or the right to maintain or operate, the Property; (vi) all public utility company rights, if any, easements and franchises to lay, install, maintain and operate lines, poles, wires, cables, pipes, distribution boxes and other fixtures and facilities in, over, under and upon the Property which were disclosed in title commitment delivered to Buyer by the Title Company prior to the expiration of the Due Diligence Period, and (vii) such matters as the Title Company shall be willing, without special premium to Buyer, with respect to the title policy issued by the Title Company to Buyer at Closing, to omit as exceptions to coverage.

(b) Anything to the contrary in this Agreement notwithstanding, during the Due Diligence Period, Buyer and its authorized agents shall have the opportunity to satisfy themselves as to the status of title matters. Buyer shall notify Seller in writing (the "Title Notice") prior to the expiration of the Due Diligence Period which exceptions to title, if any, will not be accepted by Buyer. If Buyer fails to notify Seller in writing of any exceptions to title by the expiration of the Due Diligence Period, then Buyer shall be deemed to have approved the condition of title. If Buyer notifies Seller in writing that Buyer objects to any exceptions to title, then Seller shall have five (5) days after receipt of the Title Notice to notify Buyer in writing (i) that Seller will endeavor to remove such objectionable exceptions from title on or before the Closing; or (ii) that Seller elects not to cause such exceptions to be removed. If Seller fails to notify Buyer in writing of its election within said five (5) day period, then the Seller shall be deemed to have elected not to cause such exceptions to be removed. If Seller gives Buyer notice under clause (ii) above, then Buyer shall have five (5) days within which to notify Seller in writing that Buyer will nevertheless proceed with the purchase and take title to the Property subject to such exceptions; otherwise, this Agreement shall automatically terminate upon the expiration of such 5-day period. If this Agreement shall not be terminated, and if at any time between the end of the Due Diligence Period and the Closing Buyer shall discover one or more newly recorded title exceptions to which it wishes to object, then Buyer shall send to Seller Buyer's further notice of objection ("Additional Title Notice") promptly upon discovery of said new objectionable matters. Seller shall have five (5) days after receipt of the Additional Title Notice to notify Buyer in writing (i) that Seller will endeavor to remove such newly objectionable exceptions from title on or before the Closing; or (ii) that Seller elects not to cause such exceptions to be removed. Seller's failure to give its notice shall be deemed its election not to remedy such objections. If Seller gives Buyer notice under clause (ii) above, then Buyer shall have five (5) days within which to notify Seller in writing that Buyer will nevertheless proceed with the purchase and take title to the Property subject to such exceptions; otherwise, this Agreement shall automatically terminate upon the expiration of such 5-day period. If this Agreement is terminated pursuant to the foregoing provisions of this paragraph, then neither party shall have any further rights or obligations hereunder, the Deposit and all interest thereon shall be returned to Buyer.

**5. Buyer's Inspection Rights.**

(a) The Buyer will have until 12:00 pm EDT, November 16, 2026 (being the fourteenth day following the Parties' execution of, and pursuant to that offer to purchase dated November 2, 2026, hereinafter, the "Offer") to conduct diligence (the "Due Diligence Period") with respect to the Property. Within the Due Diligence Period Seller and/or XC has provided or will provide the Buyer with all due diligence information reasonably requested by the Buyer regarding the Property to the extent in Seller's actual possession and/or control, including without limitation, all documents, materials and due diligence information relating to the Property, including any environmental site assessments, historical invoices for utilities, insurance information, title reports and maintenance contracts. Seller shall also provide the Buyer with any information and materials it provides to any other potential bidder. Seller shall allow the Buyer and its consultants, professionals, investors, contractors and representatives (collectively, "Representatives") access to the Property on reasonable advance notice to Seller consistent with the terms of clause (b) below, from the date hereof through the earlier of (i) termination of this Agreement, as the case may be, or (ii) the closing of the Sale (as hereinafter defined). Seller and/or XC shall provide to Buyer a copy of an existing Phase I environmental site assessment. Seller further acknowledges that it has no actual knowledge of the existence of any existing environmental condition at the Property that would require further investigation. Buyer shall have no right to terminate this Agreement based on the results of its due diligence, and the Parties, subject to the other conditions of Closing and other terms as set forth in this Agreement, shall proceed to Closing (as hereinafter defined).

(b) From and after the date of the execution hereof by both Buyer and Seller and notwithstanding any term or provision herein contained to the contrary, Seller shall afford Representatives of Buyer reasonable access to the Property for the purposes of satisfying Buyer with respect to its due diligence and title. Such access shall be at the sole risk of Buyer, Buyer agreeing to repair any damage caused by its negligence and to indemnify and hold harmless Seller for any liability resulting therefrom. Buyer shall advise Seller of the names and business affiliations of all such authorized representatives at least twenty-four (24) hours before their arrival at the Property.

**6. The Closing.**

(a) Without limiting the foregoing, Seller shall file a sale motion for approval and conduct of the auction and sale of the Property to Buyer (or other successful bidder), subject to counterbids, at a hearing on November 19, 2026 (the "Sale Approval Hearing"). The sale motion shall also state that the net sale proceeds (subject to a holdback for the amounts identified in Section 6[h] below) are paid directly to XC less other usual and necessary expenses incurred as part of the sale, including allocable fees payable to the US Trustee on a quarterly basis, and recording costs/excise or transfer taxes, and that overbids must be five percent (5%) pursuant to the local rules of the Bankruptcy Court.

(b) The Sale Approval Hearing shall be scheduled for November 19, 2026 (or such other date as may be continued solely by the Bankruptcy Court). Any order approving the Sale to Buyer (the "Sale Order") shall be in form and substance reasonably acceptable to Buyer and Seller, and include the following: (i) findings and conclusions pursuant to Bankruptcy Code sections 105(a) and 363(b), (f) and (m), that (A) the terms and conditions of this Agreement are approved by the Bankruptcy Court, and B) the Seller is authorized and empowered to close on the sale of the Property pursuant to this Agreement and to sell to Buyer (or such other successful bidder) the Property, free and clear of any and all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code ("Interests"), with all such Interests to attach to the net proceeds of the sale of the Property in the order of their priority and having the same validity, force and effect (if any) which they now have against the Property (the "Sale"), (ii) findings and conclusions that (A) due and proper notice has been afforded in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the local rules of the Bankruptcy Court and the orders of the Bankruptcy Court and all aspects of the transactions contemplated by this Agreement have been adequately disclosed; (B) the Purchase Price under this Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code for the Property; (C) Buyer is a good faith purchaser as that term is used in Section 363(m) of the Bankruptcy Code; (D) the Sale has not been entered into fraudulently and Buyer has not engaged in collusive bidding or otherwise violated the provisions of Section 363(n) of the Bankruptcy Code; (E) title to the Property shall vest in Buyer free and clear of all Interests, and Buyer shall not be liable for, any and all liabilities related to Seller's pre-closing operations of any type or nature whatsoever; (F) Buyer shall not be liable for any claims or debts of Seller, except those assumed by Buyer; (G) the Bankruptcy Court will retain jurisdiction over enforcement of the Sale Order and to determine any disputes arising out of the Sale Order; and (H) Buyer is not intended to be and shall not be deemed to be a successor to Seller; and (iii) a waiver of the stay imposed by Bankruptcy Rule 6004(h). Furthermore, the Parties agree that the Sale Hearing may be adjourned solely upon consent of the Buyer. Seller, and Lender.

(c) Absent termination of this Agreement or entry of a Sale Order authorizing the sale of the Property to another entity, the Parties shall be obligated to close on the Sale (the "Closing") on November 20, 2026; provided, however, that Buyer has requested, and the Closing shall occur on such later date as Seller and XC may agree in writing, but in no event later than [December 4, 2026]. If Seller and XC do not so agree, Buyer shall close on November 20, 2026 as provided above.

(d) At Closing, Seller shall deliver the following to the Buyer, each of which shall be a condition to Buyer's obligation to purchase the Property on the Closing Date:

(1) The Deed as required by Section 4(a) above;

(2) A duly executed counterpart of a Closing Statement in form and content reasonably satisfactory to Buyer and Seller;

(3) The information necessary to complete Internal Revenue Service Form 1099S, including a §6045 designation of the Escrow Agent as the reporting party;

(4) The full amount of all customer deposits paid to the hotel;

(5) Assignment of all leases and occupancy agreements, and letters to all tenants and occupants announcing the change in ownership; and

(6) Such additional documents, instruments, agreements, certificates, resolutions, and waivers as Buyer or its title insurer may reasonably request to transfer title to the Property to Buyer in accordance with this Agreement and to issue a title policy without standard exceptions, including a non-foreign ("FIRPTA") affidavit and a customary title affidavit.

Buyer may waive compliance on Seller's part under any of the foregoing items by an instrument in writing.

(e) At Closing, Buyer shall deliver to Seller the following each of which shall be a condition to Seller's obligation to sell the Property on the Closing Date:

(1) The Purchase Price;

(2) A duly executed counterpart of the Closing Statement; and

(3) Such additional documents, instruments, agreements, certificates and waivers as Buyer's title insurer may reasonably request to transfer title to the Property to Buyer.

Seller may waive compliance on Buyer's part under any of the foregoing items by an instrument in writing, unless such instrument requires approval of the Court.

(f) In addition to the closing conditions referred to above, closing of the Sale shall be contingent upon the following (without which, absent waiver by Buyer, shall result in Buyer's right to terminate this Agreement and receive a refund of the Deposit):

(1) Entry of the Sale Order providing for the sale of the Property to Buyer in the manner provided for in this Agreement including, without limitation, Section 6;

(2) The issuance of a title policy by the Title Company to Buyer insuring Buyer's fee ownership of the Property free and clear of all Interests, including all monetary liens voluntarily granted by Seller (including the liens of Lender, and also including, without limitation, tax liens and other unpaid taxes) and all matters relating to the Bankruptcy Case; and

(3) No injunction, stay, or similar Order issued by any Governmental Authority' shall be in effect that restrains, enjoins, stays, or prohibits he consummation of the transactions set forth in this Agreement and there must not be in effect any Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(g) Seller represents and warrants to Buyer that Seller holds fee simple title and interest in and to the Land, Improvements, and Appurtenances comprising the Property in its entirety, and has full right and authority, without the prior consent of any third party or governmental entity or administrative or juridical authority other than the Bankruptcy Court to enter into and consummate this transaction. Except as expressly stated in this Agreement concerning any contracts or other obligations that Buyer may elect to assume, Buyer is not assuming any obligations or liabilities of Seller or otherwise relating to the Property with respect to acts and omissions prior to the Closing (all of which shall remain with Seller from and after the Closing).

Buyer acknowledges that the Bid Procedures were approved by the Bankruptcy Court, and Buyer shall not be entitled to any break-up fee, expense reimbursement, or other bid protection. Non- insider unsecured creditors, excluding any creditor receiving proceeds of the sale, shall be provided a $50,000 carveout in addition to the Chapter 11 administrative expenses carveout from XC's cash collateral being held by Debtor for pro rata distribution. If Buyer fails to close due to a material breach by Buyer of any specified material obligation(s) under this Agreement, Buyer shall forfeit the Deposit, which shall be retained by Seller as liquidated damages as its exclusive remedy in respect thereof. Damages being difficult to ascertain as the result of a material breach by Buyer, the Parties agree that the amount of the Deposit shall be deemed adequate compensation to Seller.

For purposes of this Agreement, the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non- governmental regulatory authority or quasi-governmental authority, or any arbitrator, court or tribunal of competent jurisdiction.

**7. Apportionments.**

The following are to be apportioned as of 12:01 A.M., on the date of Closing on the basis of a 365-day year:

(a) Real and Personal Property Taxes. Real Property taxes for the Property for the current year and assessments, if any, shall be apportioned between the Parties hereto as of 12:01 A.M. on the date of Closing for the period of time to which the then outstanding and unpaid tax bills apply. If the amount of said taxes or assessments is not known at such time, they shall be apportioned on the basis of the immediately preceding period for which the taxes have been paid or which were due. Such taxes and/or assessments shall be reapportioned as soon as the new rate or valuation can be ascertained. Within ten (10) days after such reapportionment, if any, Seller shall notify Buyer of such reapportionment in writing, and Seller or Buyer, as the case may be, shall, within ten (10) days of the date of such notice, remit to the other the amount owed as a result of such reapportionment. The Buyer shall assume and retain all rights to any abatements as the successful bidder.

(b) Water. Sewer and Utility Charges. All water, sewer and utility charges shall be apportioned as of 12:01 A.M. on the date of Closing. If such apportionment cannot be calculated accurately at that time, the same shall be calculated within thirty (30) days after Closing and either Party owing the other Party a sum of money based on such subsequent apportionment shall promptly pay said sum to the other Party.

(c) Operating Expenses. All expenses normal to the operation and maintenance of the Property not otherwise addressed herein, as to the hotel and including, without limitation, fuel in any tank, annual permit or inspection fees, insurance premiums (as to those policies which Buyer determines will be continued after Closing), hotel deposits of customers of the hotel and service contracts which Buyer may elect to assume or compel Seller to assume on Buyer's behalf (which contracts Buyer may compel Seller to reject), shall be apportioned as of 12:01 A.M. on the date of Closing. If such apportionment cannot be calculated accurately at that time, the same shall be calculated within thirty (30) days after Closing and either Party owing the other Party a sum of money based on such subsequent appointment shall promptly pay such sum to the other Party.

(d) Rents. All rental amounts paid by tenants and other occupants of the office portion of the building(s) on account of the rental period in which the date of Closing shall occur.

**8. Payment of Costs.**

(a) All transfer taxes and deed stamp excise tax payable upon execution and recording of the Deed (to the extent due and owing, the "Transfer Taxes") shall be paid by Seller.

(b) Buyer shall pay all title abstracting costs, costs incurred in connection with the preparation of a preliminary title insurance binder and with the title insurance policy and survey, title insurance premium, fees for recording of the Deed conveying title to Buyer. The costs referred to in the foregoing section (b) are the "Closing Costs."

(c) Seller shall pay Seller's attorneys' fees incurred in connection with this transaction and other closing costs otherwise customarily paid by sellers in Massachusetts real estate purchases/sales and the US Trustee quarterly fees allocated to the sale price of the Property. Buyer shall pay Buyer's attorneys' fees incurred in connection with this transaction.

**9. Termination of Agreement.**

This Agreement may be terminated (i) by mutual consent of Seller and Buyer; (ii) by Buyer (a) in the event of a material breach by Seller of this Agreement, subject to Buyer's remedies in respect thereof pursuant to this Agreement; (iii) by Seller in the event of a material breach by the Buyer of its Agreement subject to the terms hereof; or (iv) by Seller if the Agreement is not fully executed and delivered and the Deposit not timely paid by the Bid Deadline established under the Bid Procedures.

**10. Loss by Fire or other Casualty; Condemnation.**

In the event that, prior to Closing, the Property, or any part thereof, is destroyed or damaged or if condemnation proceedings are commenced against any portion of the Property, Buyer shall have the right, exercisable by giving notice of such decision to Seller within fifteen (15) days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, in which case the Deposit and any interest accrued thereon shall be returned to Buyer and neither Party shall have any further rights or obligations hereunder except as otherwise expressly provided herein. If Buyer elects to accept the Property in its then condition, all proceeds of insurance or condemnation awards payable to Seller by reason of such damage, destruction, or condemnation shall be paid or assigned to Buyer irrespective of any applicable deductible (which deductible, if any, shall be paid by Seller) or condemnation awards paid to Buyer by Seller. In the event of any cost to repair the destruction or damage to the Property, Buyer shall accept the Property in its then condition and proceed with the purchase as herein provided without reduction of the Purchase Price to the extent of the cost of repairing such damage or replacing the damaged property exceeds the amount of any insurance proceeds.

**11. Possession.**

Full possession of the Property, with all tenants, leases, licenses, occupancy agreements, including any hotel management agreement assigned to Buyer (collectively, "Leases") and occupants (and free of all rights of first offer or other purchase rights) is to be delivered at the Closing, the Property to be then (a) in the same condition as now, subject to the terms of Section 12 hereof, except that Seller shall remove from the Property prior to the closing all personal property and equipment (which is not permanently affixed or used in the operation of the hotel or office building or elsewhere on or about the Property) including, without limitation, the inventory and equipment necessary for operation of the Property and Improvements, and (b) in compliance with any applicable easement, covenant or restriction of record and all applicable law.

**12. Maintenance of and Insurance upon the Property.**

Between the time of Seller's execution of this Agreement and Closing, Seller shall; (i) maintain the Property in the same order, condition, and repair as is consistent with its past practices, reasonable wear and tear and damage by casualty excepted; (ii) operate the Property in the same manner as before the making of this Agreement, the same as though Seller were retaining the Property; and (iii) keep the Property insured, at its expense, against fire and other extended coverage perils in an amount not less than one hundred percent (100%) of its replacement cost (without any co-insurance liability).

**13. No Leases.**

From and after the Effective Date, Seller shall not enter into any Leases or encumbrances upon the Property or enter into any binding or non-binding letters of intent with prospective tenants or other potential parties to Leases without obtaining Buyer's prior written approval in each case.

**14. Miscellaneous.**

(a) Notices. Unless otherwise specifically set forth herein, any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given when (I) delivered personally, (2) five (5) Business Days after being deposited in a United States Post Office, registered or certified mail, postage prepaid, return receipt required, or upon delivery or rejected delivery by a reputable overnight courier service providing proof of delivery, (3) upon delivery by electronic mail (provided a copy is sent by overnight courier with one Business Day of delivery of the notice by electronic mail) and addressed as follows:

If to Seller:

Southbridge Associates LLC 36 Washington Street, Suite 390 Wellesley, MA 02481 Attn: Barry R. Lundgren E-mail:

With a copy to:

Madoff & Khoury, LLP 124 Washington Street, Suite 202 Foxboro, MA 02035 Attn: David Madoff, Esq. madoff@mandkllp.com Attn: Nina M. Parker, Esq. parker@mandkllp.com

Ns Riemer & Braunstein LLP 100 Cambridge Street, 22nd floor Boston, MA 02114 Attn: Alan L. Braunstein, Esq. E-mail: abraunstein@riemerlaw.com

If to Buyer:

Webster Ventures, LLC 14 Henry Road Webster, MA 01570 Attn: Christopher Robert, Manager E-mail: chrisrobert1@icloud.com

With a copy to:

Prince Lobel Tye LLP 1 Mercantile Street, Suite 220 Worcester, MA 01608 Attn: Douglas Radigan, Esq.

or such other address as either Party may from time to time specify in writing to the other.

(b) Brokers and Finders. Seller has not had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker, auctioneer, or other person who can claim a right to a commission or finders' fee as a procuring cause of the sale contemplated herein, and in any case there has been no pre-bankruptcy approval sought or obtained by the Seller regarding any such professional in relation to this transaction.

(c) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, heirs, administrators, and assigns. Without being relieved of any liability under this Agreement, Buyer reserves the right to take title to the Property in a name other than that of Buyer or to assign its rights under this Agreement.

(d) Amendments and Termination. This Agreement may be amended or modified or terminated only by a written instrument executed by Seller and/or Buyer as applicable, and if required, further approval by the Court, except where unilateral termination by a Party is expressly permitted pursuant to this Agreement.

(e) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and applicable provisions of the federal Bankruptcy Code and rules of the Bankruptcy Court.

(f) Merger of Prior Agreements. This Agreement supersedes all prior agreements and understandings between the Parties hereto relating to the subject matter hereof (including, without limitation, the Offer) and constitutes the entire agreement between the Parties hereto with respect to the transactions contemplated herein.

(g) Enforcement. In the event either of the Parties fails to perform any of its obligations under this Agreement or in the event a dispute arises concerning the meaning or interpretation of any provision of this Agreement then such dispute shall be decided by the Bankruptcy Court which the Parties agree have exclusive jurisdiction over the agreement and the Parties by law and the Agreement.

(h) Remedies. If Seller shall tender the Deed and all other closing documents required by this Agreement and shall otherwise be in compliance with its obligations hereunder and all conditions precedent to Buyer's obligations have been satisfied, performed or waived by Buyer (and other closing requirements satisfied) and if Buyer shall fail or refuse to close title as required by the terms of this Agreement or if Buyer is otherwise in default hereunder so that Seller has the right to refuse to close this transaction, Seller shall have the right to retain the Deposit, which shall be Seller's sole and exclusive remedy at law or in equity as more particularly set forth elsewhere in this Agreement.

In the event that Seller shall fail to tender the Deed and all other Closing documents required by this Agreement and otherwise comply with its material obligations under this Agreement, and all conditions precedent to Seller's obligations have been satisfied, performed or waived by Seller and if Seller shall fail or refuse to close title as required by the terms of this Agreement, said failures being deemed a material breach, Buyer shall have the right to a return of the Deposit, which shall be Buyer's sole and exclusive remedy at law and in equity with respect to Seller's breach.

(i) Time of Essence. Time is of the essence in this Agreement. No waiver of any breach or default by any Party hereto shall be considered to be a waiver of any other or subsequent breach or default.

(j) Waiver of Trial by Jury. Buyer and Seller hereby knowingly and voluntarily waive any rights to request or require trial by jury in any proceeding for any legal or equitable remedy, or in any action based, in whole or in part, on failure of performance or other default under this Agreement.

(k) Exhibits and Schedules. All Exhibits referred to in this Agreement shall be deemed to be attached hereto and made a part hereof.

**15. Title to Real Estate.**

To enable Seller to make the conveyance as herein provided, Seller may at the time of Closing use the Purchase Price or any portion thereof to clear the title of the Property of any or all encumbrances or interests, provided that all instruments so procured are recorded prior to or the recording thereof is assured (via affirmation title insurance or otherwise) at the recording of the Deed for the Property.

**16. Business Day.**

In the event that the date for delivery of any notice or the performance by any Party of any obligation of such Party under this Agreement, shall occur on a Saturday, Sunday or other legal holiday recognized in the Commonwealth of Massachusetts or the municipality or county in which the Property is located (a "Non-business Day"), the time for delivery of such notice or performance of such obligation shall be the next day which is not a Non-business Day (a "Business Day").

**17. Confidentiality.**

Up to and ending upon the holding of the Sale Hearing, except for the Offer and this Agreement, Buyer's identity, its financial information, and the identity of any of financing sources, are confidential and are not to be disclosed to anyone, including any other potential bidders, except that Seller and Buyer may disclose such information to (i) its legal and financial advisors, investors (prospective and current), representatives and other persons involved with the Sale that reasonably need to know such information, (ii) any lender or creditor holding a lien or other encumbrance on the Property, including its legal and financial advisors who need to know such information in connection with its respective evaluations of the transaction contemplated by this Agreement, (iii) the Office of the United States Trustee or (iv) as required by law, court order, SEC requirement, subpoena or otherwise in a litigation, provided that such advisors are informed of the confidential nature of such information and are directed to maintain its confidentiality.

**18. Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Additionally, telecopied signatures or e-mailed signatures may be used in place of original signatures on this Agreement. Seller and Buyer intend to be bound by the signatures on the telecopied or e-mailed document, are aware that the other Party will rely on the telecopied, Docusign, or e-mailed signatures, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF. the Parties hereto have executed this Agreement, as of the date first above written.

SELLER:

SOUTHBRIDGE ASSOCIATES LLC, a Delaware limited liability company

By: Franklin Advisors Southbridge LLC, A Massachusetts limited liability company, its sole member

By: YC Southbridge LLC, manager, a Massachusetts limited liability company

Byf

Date:

11/2/26

BUYER:

WEBSTER VENTURES, LLC,

By:

Date: ___________

Christopher Robert, Manager

[Signature Page to Asset Purchase Agreement]

# **EXHIBIT 3**

MERRILL
A BANK OF AMERICA COMPANY

Christopher D. Robert 2000 Trust and Beverly A. Robert 2000 Trust, TIC
14 Henry Road
Webster, MA 01570

November 18, 2026

RE: Verification of Deposit – Standard

# Important Notice

This is in response to the Verification of Deposit (VOD) request for the Merrill Lynch account of Christopher D. Robert 2000 Trust and Beverly A. Robert 2000 Trust, TIC. Details appear below.

| | |
|---|---|
| **Account Type** (CMA) | |
| **Account Number(s)** | XXX-XXS15 |
| **Value as of Date** | 11/17/2026 |
| **Account Value(s)*** | In excess of $5,250,000 upon request |

*This total is as of COB on the listed statement date. It includes Money Fund shares/balances, marginable/non-marginable securities, and outstanding margin balances. If an average balance is requested, it is calculated based upon the monthly/quarterly balance.

**Comments**

*Christopher Robert is a grantor and trustee of The Chistopher D. Robert 2000 Trust and is trustee of The Beverly A. Robert 2000 Trust and has full and immediate access to the funds upon request.*

Signature of Merrill Lynch Branch Office Management Team (OMT)

Martin Sheehan

Printed Name

11-18-2026

Date

617-946-4206

Phone Number

MERRILL
A BANK OF AMERICA COMPANY

This information is furnished to you in strict confidence in response to your request and is solely for your use for the purposes described in the Verification of Deposit request. If you have any questions, please contact the person whose signature appears above at the phone number provided. This information is provided as a courtesy and Merrill Lynch is not liable or responsible for any decisions made, in whole or part, on reliance upon this information.

**Applicable to non-retirement accounts:**
Please be advised our cash management account program permits account holders to access the assets in the account by Visa card and checks, which are drawn and processed against a Merrill Lynch account maintained for the customer at Bank of America, N.A. However, the account holder does not maintain a depository balance at that bank. The information provided above may change daily due to activity in the account and/or changes in market value of assets held in the account. This information is provided as a courtesy and Merrill Lynch (including its affiliates) is not liable or responsible for any decisions made, in whole or in part, on reliance upon this information.

**Applicable to retirement accounts:**
If the Account Holder's assets are held in an Individual Retirement account under which Merrill Lynch serves as passive custodian. Please be advised that pursuant to Section 408(e)(4) of the Internal Revenue Code of 1986, as amended, use of such funds as security for a loan may disqualify the tax-deferred status of the Individual Retirement Account and may result in adverse tax consequences for the account holder. This information is provided as a courtesy and Merrill Lynch is not liable or responsible for any decisions made, in whole or part, on reliance upon this information. Neither Merrill Lynch or its affiliates provide tax accounting or legal advice. For further information, please consult your independent tax or legal advisor.

L-03-19

Merrill Lynch makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") and other subsidiaries of Bank of America Corporation ("BofA Corp."). Merrill Edge is available through MLPF&S, and consists of the Merrill Edge Advisory Center (investment guidance) and self-directed online investing. MLPF&S is a registered broker-dealer, Member SIPC and a wholly owned subsidiary of BofA Corp.

Banking products are provided by Bank of America, N.A., and affiliated banks, Members FDIC and wholly owned subsidiaries of BofA Corp.

**Investment products:**

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
|---|---|---|

MLPF&S is a registered broker-dealer, registered investment adviser and Member SIPC.

© 2023 Bank of America Corporation. All rights reserved.

MERRILL
A BANK OF AMERICA COMPANY

THE BOSTON HARBOR TEAM C
100 FEDERAL STREET
17TH FLOOR
BOSTON, MA 02110
800-937-0866

November 18, 2026

# Verification of Account Value

The following information represents your account value(s) currently held with Merrill Lynch.

| Account | Account type | Account number | Value |
|---|---|---|---|
| C. ROBERT&B. ROBERT TTEES UAD 3/14/00 C. ROBERT GRANTOR, & B.ROBERT&C. ROBERT TTEES UAD | CMA | XXX-X4S15 | $5,250,000.00 |

**Total exceeds** **$5,250,000.00**

The account value(s) represents all cash, credits, debits, marginable and non-marginable securities (including cash, money fund shares, securities and outstanding margin balances) as of close of business November 17, 2026.

For additional information, please contact your Financial Advisor.

This information is furnished to you in strict confidence in response to your request and is solely for your use for the purposes described in the Verification of Account Value request. This information is provided as a courtesy and Merrill is not liable or responsible for any decisions made, in whole or part, on reliance upon this information.

**Applicable to non-retirement accounts:**
Please be advised our cash management account program permits account holders to access the assets in the account by Visa card and checks, which are drawn and processed against a Merrill Lynch account maintained for the customer at Bank of America, N.A. However, the account holder does not maintain a depository balance at that bank. The information provided above may change daily due to activity in the account and/or changes in market value of assets held in the account. This information is provided as a courtesy and Merrill Lynch (including its affiliates) is not liable or responsible for any decisions made, in whole or in part, on reliance upon this information.

Merrill Lynch, Pierce, Fenner & Smith Incorporated (also referred to as "MLPF&S" or "Merrill") makes available certain investment products sponsored, managed, distributed or provided by companies that are affiliates of Bank of America Corporation ("BofA Corp."). MLPF&S is a registered broker-dealer, registered investment adviser, Member Securities Investor Protection (SIPC) and a wholly owned subsidiary of BofA Corp.

Banking products are provided by Bank of America, N.A., and affiliated banks, Members FDIC and wholly owned subsidiaries of BofA Corp.

**Investment products:**

| | | |
|---|---|---|
| **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value** |

© 2026 Bank of America Corporation. All rights reserved.

# **EXHIBIT 4**

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD TO LIGHT TO VIEW

CONTROL NO. [redacted]

websterfive™
Webster Five Cents Savings Bank

**OFFICIAL CHECK**

DATE 11/17/2026

Check #: 87051

Pay to the order of

MADOFF & KHOURY LLP IOLTA

One Hundred Thousand Dollars and 00/100 Cents

$100,000.00

VOID IN 180 DAYS

Remitter

CHRISTOPHER D ROBERT

RE: THE BID DEPOSIT FOR WELLSWORTH HOTEL

RUB HERE RUB HERE RUB HERE

Brenda Sullivan

AUTHORIZED SIGNATURE

Security Features Included. Details on Back.

⑈87051⑈ ⑆211372857⑆ [redacted]